RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0131p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RUBY HICKS, Administrator of the Estate of
Quandavier K. Hicks,

     *Plaintiff-Appellant*,

  *v.*

DORIS A. SCOTT, JUSTIN T. MOORE, and BENJAMIN M.
SCHNEIDER, individually and in their official capacities
as employees of the City of Cincinnati, Ohio; CITY
OF CINCINNATI, OHIO,

     *Defendants-Appellees*.

No. 19-3410

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:16-cv-00621—Michael R. Barrett, District Judge.

Decided and Filed:  May 1, 2020

Before:  GIBBONS, KETHLEDGE, and BUSH, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:**  J. Robert Linneman, H. Louis Sirkin, SANTEN & HUGHES, LPA, Cincinnati, Ohio, for Appellant.  Shuva J. Paul, Marva K. Benjamin, CITY OF CINCINNATI, Cincinnati, Ohio, Kimberly A. Rutowski, HARDIN, LAZARUS & LEWIS, LLC, Cincinnati, Ohio, for Appellees.

_____

### OPINION

_____

JULIA SMITH GIBBONS, Circuit Judge.  Quandavier Hicks ("Quandavier") died from a single bullet to the chest after Cincinnati police officers Doris Scott, Justin Moore, and Benjamin

Schneider entered his apartment through an unlocked door. Ruby Hicks ("Hicks"), administrator of Quandavier's estate, filed suit in the Southern District of Ohio, naming Scott, Moore, Schneider, and the City of Cincinnati as defendants. She asserted federal claims pursuant to 42 U.S.C. § 1983 for unlawful entry, excessive force, and deliberate indifference to a serious medical need, as well as state-law claims for wrongful death and battery. The district court entered summary judgment for the defendants based on federal qualified immunity and immunity under Ohio law. Hicks appeals those decisions. We find that the district court erred by granting qualified immunity to Scott, Moore, and Schneider on the unlawful entry claim. Accordingly, we reverse as to that claim, affirm as to the excessive force, deliberate indifference, and state-law battery claims, and remand for the district court to evaluate the municipal liability and wrongful death claims consistent with this opinion.

I.

Shortly before 11:00 PM on June 9, 2015, Scott and Moore responded to a reported incident of menacing in the Northside neighborhood of Cincinnati. When the officers arrived at the scene, Raquella Norman and Jonathan Jones alleged that Quandavier had driven by their home earlier that night and threatened to kill them. According to Jones, the incident occurred after he accused Quandavier of stealing from the couple's house. Jones said that he was scared and believed that Quandavier owned and carried guns.

Scott, concerned that the situation might escalate, asked Officer Christopher Loreaux to locate Quandavier so that the officers could speak with him and get his side of the story. Jones told Scott and Moore that Quandavier lived nearby on Chase Avenue and had been driving a silver Ford Focus with a damaged side-view mirror. Jones could not provide an exact address. Nevertheless, Loreaux drove along Chase Avenue and identified a vehicle fitting Jones's description. The vehicle was parked across the street from 1751 Chase Avenue.

After Loreaux identified the vehicle, Schneider joined him at 1751 Chase Avenue. When Schneider arrived, he placed his hand on the car's hood and felt that it was hot, indicating to him that it had been driven recently. When the officers ran the car's license plate, however, they

were unable to find an associated address for Quandavier. The vehicle instead came back as registered to Ariel Wilson.

Shortly after the officers ran the license plate, a woman exited from a door along the side of 1751 Chase Avenue and walked across the street to the Ford Focus. The officers walked over and questioned her. The woman, whom the officers would later learn was Wilson, told Schneider and Loreaux that she had just come from seeing her boyfriend "Jason" in the "second floor apartment." DE 38, Schneider Dep., Page ID 702–03. Wilson said that neither she nor anyone else had driven the Ford Focus recently and denied knowing anyone named Quandavier.

At that point, Wilson departed. Schneider found Wilson's account not credible based on his earlier assessment that the car had recently been driven. He concluded that the Ford Focus was likely the vehicle that Quandavier had been driving earlier and, in turn, that Quandavier was likely the boyfriend Wilson had been visiting in the second-floor apartment.

Scott and Moore arrived shortly thereafter. As the four officers—Scott, Moore, Schneider, and Loreaux—stood outside of 1751 Chase Avenue, they heard a voice call out "Ariel" from what they thought was the second floor. DE 42, Loreaux Dep., Page ID 1009; DE 36, Scott Dep., Page ID 366. The officers deduced that the voice was likely that of Quandavier. They decided to approach 1751 Chase Avenue to see if they could locate and speak with Quandavier.

The structure located at 1751 Chase Avenue is a two-family home divided into two separate apartment units: one unit located on the first floor of the house and another unit located on the second and third floors of the house. A door at the front of the house leads to the first-floor unit. A separate door along the side of the house leads to the upstairs unit. Quandavier rented the upstairs unit.

After knocking on the front door and getting no answer, the officers went to the side of the building where the entrance to the upstairs apartment is located. The door was closed. It had two deadbolt locks, both clearly visible, and a curtain covering the top half of the door, which was glass. Behind the curtain were metal security bars. The door had no knocker, bells, or nameplates.

The exterior side door opens into a small foyer. A few steps inside is a stairway leading to the building's upper floors. The stairway plateaus onto a small landing, turns 180 degrees to the left, and then continues up. After another few steps, the stairway opens onto a second-floor landing with four doors. According to Quandavier's uncle, Robert Thompson, none of these areas were "accessible to the public" or "shared with the First Floor Apartment." DE 44-6, Thompson Aff., Page ID 1212.

When Scott knocked on the exterior door, however, it swung open.[1] The officers let themselves in. They acknowledge that they did not have a warrant and that there were no exigent circumstances. Scott entered first, followed by Moore and Schneider. Loreaux remained stationed outside. Neither Scott nor Moore recall any of the officers announcing their presence or identifying themselves as police.

Scott, Moore, and Schneider proceeded up the stairway. When the officers reached the second-floor landing, they observed two closed doors immediately to their left—forming a 90-degree angle—and an area with at least one door to their right. None of the doors had locks, numbers, knockers, or nameplates. Scott knocked at least twice on one of the closed doors to her left. After the second round of knocking, she heard someone descending a stairway behind the other door immediately to her left. She stepped backed slightly.

As the stairway door opened, Scott "saw the barrel of a rifle pointed at [her] face." DE 36, Scott Dep., Page ID 433. Moore and Schneider also saw the rifle pointed directly at her. Scott testified that the rifle was "a few feet" from her face when Quandavier opened the door, *id.* at 433, and Schneider estimated that the end of the rifle was "five feet" or "[m]aybe a few feet" from Scott, DE 38, Schneider Dep., Page ID 828. Schneider also described Quandavier as "nonchalantly" panning the rifle from left to right "at waist level," adding that it did not appear as though he was "picking out anyone in particular." *Id.* at 783, 816–17.

As the rifle emerged from the stairway door, Moore reached for its barrel. His hand was on the barrel as Scott fired her weapon. Moore did not instruct Quandavier to drop his rifle

---

[1]Wilson had left the door unlocked when she exited the building. According to Thompson, Quandavier normally locked the door.

before reaching for the barrel, nor did Scott issue any commands before firing her weapon. Schneider estimated that the entire encounter lasted "[t]wo to three seconds, at most." *Id.* at 787.

The bullet from Scott's gun hit Quandavier on the left side of his chest, piercing his lungs and "transecting," or cutting across, "[his] ascending aorta." DE 44-12, Coroner Report, Page ID 1280. Quandavier collapsed instantly and Moore was left standing with the rifle in his outstretched hand. Schneider testified that Quandavier was "clearly . . . struggling for his life" after being shot. DE 38, Schneider Dep., Page ID 833. Both Scott and Schneider immediately radioed for paramedics. And Schneider, perceiving a need to provide medical assistance to Quandavier, attempted to first secure him with handcuffs.

Schneider ultimately failed to apply the handcuffs or provide first aid. The amount of blood gushing from Quandavier's wound and mouth prevented him from properly securing Quandavier's hands. And before Schneider was able to provide Quandavier with any medical attention, he was interrupted by a voice coming from the third floor. Schneider, upon hearing the voice, immediately redirected his efforts to securing the third floor. With the assistance of Moore, he detained the newly discovered individual—an overnight guest of Quandavier's named Robert Boggs—and conducted a sweep of the upstairs. Schneider had no further interaction with Quandavier.

Loreaux had remained stationed outside the building as the other officers looked for Quandavier inside. But when he heard the gunshot, Loreaux immediately entered through the side door and went toward the second-floor landing. He testified that, after nearly reaching the landing, Schneider handed him Quandavier's rifle. Schneider then asked him to retrieve crime scene tape. Loreaux leaned the rifle against the wall of the lower landing and left to retrieve the tape.

As soon as he exited the building, however, Loreaux saw that another officer was already retrieving the tape, so he went back inside. Loreaux estimated that only "30 to 45 seconds" passed between setting down the rifle and his return to the second floor. DE 42, Loreaux Dep., Page ID 1055. Loreaux testified that, as soon as he returned, he asked Schneider whether Quandavier still required medical attention. Schneider testified that he did not recall any

interaction with Loreaux regarding Quandavier's condition. According to Loreaux, however, Schneider told him that Quandavier was dead. As a result, Loreaux never examined Quandavier and made no attempt to administer first aid. Quandavier died at the scene without receiving medical attention.

In June 2016, Hicks filed suit in the Southern District of Ohio, naming Scott, Moore, Schneider, and the City of Cincinnati as defendants. She alleged federal claims pursuant to 42 U.S.C. § 1983 for unlawful entry, excessive force, and deliberate indifference to a serious medical need, as well as state-law claims for wrongful death and battery. The district court, finding that Scott, Moore, and Schneider committed no constitutional violations, entered summary judgment in their favor based on both federal qualified immunity and immunity under Ohio law. The court also entered summary judgment in favor of the City of Cincinnati, explaining that there could be no municipal liability without an underlying constitutional violation. Hicks timely appealed.

## II.

We review *de novo* the district court's grant of summary judgment on qualified immunity grounds. *Watson v. Pearson*, 928 F.3d 507, 510 (6th Cir. 2019). Summary judgment is only proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, we view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in her favor. *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004).

## III.

Hicks challenges the district court's grant of qualified immunity to the defendants on her unlawful entry, excessive force, and deliberate indifference claims. She also challenges the district court's related grant of summary judgment to the defendants on her municipal liability and state-law claims. Because the viability of Hicks's municipal liability and state-law claims is closely intertwined with the availability of qualified immunity, we address the issue of qualified immunity first.

A.

At summary judgment, a government official is entitled to qualified immunity unless the plaintiff can establish both that (1) there is a genuine dispute of material fact as to whether the official deprived her of a constitutional right, and (2) the right was clearly established at the time of the official's actions such that a reasonable official would have known that her actions were unconstitutional. *See Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009). A reviewing court has "discretion to decide the order in which to engage these two prongs." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). Here, the district court held that Hicks failed to create a genuine dispute of material fact as to each of her constitutional claims and that the defendants were therefore entitled to qualified immunity. We address each of the constitutional claims in turn.

1.

Hicks argues that the district court erred in finding that Quandavier lacked an objectively reasonable expectation of privacy in the foyer, stairwell, and second-floor landing of the duplex's rear unit. She further contends that the defendants should be denied qualified immunity because the right to be free from warrantless entry into an apartment was clearly established and there is a genuine dispute of fact as to whether the defendants should have known that they had entered a private residence. We agree and reverse the district court's grant of qualified immunity to Scott, Moore, and Schneider.

a.

The Fourth Amendment protects people from "unreasonable searches and seizures." U.S. Const. amend. IV. A search conducted without a warrant is "per se unreasonable," *Katz v. United States*, 389 U.S. 347, 357 (1967), unless it "falls within a specific exception to the warrant requirement," *Riley v. California*, 573 U.S. 373, 382 (2014). The defendants here do not contest that they entered the foyer, stairwell, and second-floor landing of the duplex's rear unit without a search warrant. They also do not contend that anyone consented to their entry or that exigent circumstances made obtaining a warrant impracticable. Instead, they contend that Quandavier was never subject to a "search" within the meaning of the Fourth Amendment because he had no reasonable expectation of privacy in any of the invaded areas.

There are two analytical approaches to determining whether a Fourth Amendment search has occurred. *See United States v. Jones*, 565 U.S. 400, 408–09 (2012). The most familiar approach examines whether a person claiming Fourth Amendment protection had a "legitimate expectation of privacy" in the place that was searched. *Rakas v. Illinois*, 439 U.S. 128, 144 (1978). This is a two-part inquiry. *See Katz*, 389 U.S. at 516 (Harlan, J., concurring). First, the person claiming Fourth Amendment protection must have "exhibited an actual (subjective) expectation of privacy" in the targeted area. *Id.* Second, even if the person demonstrates a subjective expectation of privacy, that expectation must also be "one that society is prepared to recognize as 'reasonable'." *Id.* This is necessarily a fact-dependent inquiry and must be "made on a case-by-case basis." *United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000).

In recent years, however, the Supreme Court has revived a "property-based" approach to Fourth Amendment searches. *Florida v. Jardines*, 569 U.S. 1, 11 (2013); *see also Jones*, 565 U.S. at 406–07 & 406 n.3 (finding a Fourth Amendment search based exclusively on the government's "physical[] intru[sion] on a constitutionally protected area"). Under the property-based approach, "Fourth Amendment rights do not rise or fall with the *Katz* formulation" but rather retain an irreducible minimum of protection from intrusions into those areas "enumerate[d]" by the Fourth Amendment. *Jones*, 565 U.S. at 406. In turn, "when the government gains evidence by physically intruding on constitutionally protected areas," it is "unnecessary" to consider whether the intrusion violated a person's reasonable expectation of privacy under *Katz*; instead, the physical intrusion itself is "enough to establish that a search occurred." *Jardines*, 569 U.S. at 11; *see also United States v. Carriger*, 541 F.2d 545, 549–50 (6th Cir. 1976) (finding that *Katz* added to—rather than displaced—existing property-based protections under the Fourth Amendment). As the Supreme Court observed in *Jardines*, "[o]ne virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy." 569 U.S. at 11.

Under a property-based approach to Fourth Amendment searches, no location receives greater protection than a person's home and its surrounding areas. *See id.* at 6 ("[W]hen it comes to the Fourth Amendment, the home is first among equals."); *Silverman v. United States*, 365 U.S. 505, 511 (1961) ("At the [Fourth Amendment's] very core stands the right of a man to

retreat into his own home . . . ."). "[T]he Fourth Amendment has drawn a firm line at the entrance to the house." *Payton v. New York*, 445 U.S. 573, 590 (1980). To that end, "[w]hen the government gains information by physically intruding into one's home, 'a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *Morgan v. Fairfield Cty.*, 903 F.3d 553, 561 (6th Cir. 2018) (quoting *Jardines*, 569 U.S. at 5). The same is true of the physical areas "immediately surrounding and associated with the home." *Id.* These areas, known as the "curtilage," are treated as "part of [the] home itself for Fourth Amendment purposes," *Oliver v. United States*, 466 U.S. 170, 180 (1984), and receive the same property-based protections as "the interior of a structure," *Dow Chem. v. United States*, 476 U.S. 227, 235 (1986).

Turning to the present case, the district court erred in assuming that the areas intruded upon by Scott, Moore, and Schneider were distinct from Quandavier's apartment. Whether a search occurred, at least under a straightforward application of the property-based approach, depends on the "proper characterization" of those areas. *United States v. Werra*, 638 F.3d 326, 331 (1st Cir. 2011). That characterization, as we recently affirmed, is a question of fact. *Richards v. City of Jackson*, 788 F. App'x. 324, 329–30 (6th Cir. 2019). It is sufficient at this stage of the litigation that the record contains evidence to support the characterization advocated by Hicks. Quandavier's girlfriend, Ariel Wilson, repeatedly stated that the defendants "went into [Quandavier's] house." DE 44-3, Wilson Statement, Page ID 1178–79. She even described the second-floor landing where Quandavier was shot as "his room." *Id.* at 1178. That characterization was echoed by Quandavier's uncle, Robert Thompson, who described Quandavier's living area as inclusive of the second floor and stated that no portion of the unit was "accessible to the public" or "shared with the First Floor Apartment." DE 44-6, Thompson Aff., Page ID 1209, 1212. In fact, there is no documentary or testimonial evidence to support the view that these areas were anything other than interior portions of the rear apartment unit.

The layout of the duplex further evidences that the defendants entered a constitutionally protected area. The only kitchen and bathroom associated with the rear unit are located on the second floor and are connected to the third-floor bedroom via the landing. It would be anomalous to find—let alone at summary judgment—that the conduit between these core living

spaces is a public corridor, especially when there is evidence that the foyer, stairwell, and landing were controlled and used by only one person: Quandavier.  Moreover, even if the foyer and stairwell could be described as distinct from the core living spaces, they are still "intimately tied" to the apartment's interior.  *Morgan*, 903 F.3d at 561 (quoting *United States v. Dunn*, 480 U.S. 294, 301 (1987)).  Once inside the exterior door, no additional walls or doors divide the foyer and stairwell from the second-floor landing.  More so than an exposed front porch, which the Supreme Court recently held out as an "exemplar" of curtilage, the enclosed foyer and stairwell are areas "to which the activity of home life extends." *Jardines*, 569 U.S. at 7 (quoting *Oliver*, 466 U.S. at 182 n.12).  Accordingly, when viewed in a light most favorable to Hicks, the record supports that the defendants invaded a constitutionally protected area.

Moreover, even if we were to accept the defendants' contested characterization of the area as an extended corridor leading to a self-contained apartment on the third floor, Quandavier had a reasonable expectation of privacy in that space.  We have long held that tenants of multi-occupancy structures have a reasonable expectation of privacy in "common areas . . . not open to the general public." *Carriger*, 541 F.2d at 549; *see also United States v. Dillard*, 438 F.3d 675, 683 (6th Cir. 2006) (recognizing that *Carriger* remains "controlling in this circuit").  A tenant in a twelve-unit apartment building, for instance, has a reasonable expectation of privacy in a locked common area leading to multiple units.  541 F.3d at 549–52.  The same is true of an unlocked basement shared by the seven tenants of a duplex: it is expected that only the "tenants and landlord" will frequent such an area. *King*, 227 F.3d at 749–50.  It is only when a tenant should expect that members of the general public will pass through a common space—i.e., persons other than the landlord, co-tenants, and their invited guests—that she loses her reasonable expectation of privacy in that space. *Dillard*, 438 F.3d at 684.  Thus, as we explained in *Dillard*, if a tenant leaves the door to a common hallway unlocked and "ajar," and that hallway leads to the entrance of multiple units, it is not reasonable for the tenant to expect that the area will remain private. *Id.* at 682–84.

Here, viewing the evidence in a light most favorable to Hicks, the interior corridor is one in which Quandavier had a reasonable expectation of privacy.  It is uncontroverted that the corridor led to only one apartment: Quandavier's.  And there is no evidence that anyone other

than Quandavier and his guests had a right or reason to access that area; indeed, the exterior door—hardly visible from the street—was at the end of a narrow alley running parallel to the duplex.  Still, despite the exterior door's withdrawn location, Quandavier took affirmative steps to exclude the public and maintain his privacy.  There is evidence that he normally locked the door with multiple deadbolts, rebuffed prying eyes with a privacy curtain, and fortified the glass with security bars.  The lack of a doorbell and knocker could also support the inference that he had no interest in admitting strangers.  Although the defendants contend that the unlocked door divested Quandavier of any reasonable expectation of privacy, intervening acts unknown to the sole user of an area cannot independently nullify an otherwise justified expectation of privacy. *See, e.g.*, *United States v. Kimber*, 395 F. App'x 237, 247–48 (6th Cir. 2010) (holding that lock on common hallway door broken by other tenants did not undermine plaintiff's reasonable expectation of privacy).

Taken together—whether relying on a property-based or reasonable expectations of privacy approach—the district court erred in finding that the defendants did not execute a Fourth Amendment search.  We therefore reverse the district court and hold that the defendants violated Quandavier's right to be free from unreasonable searches.

b.

The district court did not reach the second prong of the qualified immunity analysis. Hicks argues that the defendants should be denied qualified immunity because a reasonable officer would have known that she was entering a constitutionally protected area. The defendants respond that, even if they violated Quandavier's right to be free from unreasonable searches, their conduct was based on reasonable mistakes of law and fact.  Because there is a genuine dispute of fact as to whether the defendants should have known that they had entered a private residence, we agree with Hicks and deny qualified immunity to Scott, Moore, and Schneider.

A government official "will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law." *Butz v. Economou*, 438 U.S. 478, 507 (1978); *see also Smith v. Thornburg*, 136 F.3d 1070, 1076 (6th Cir. 1998) (finding that officers were entitled to

qualified immunity based on their "reasonable mistake of fact in presuming that the [searched] property was public"). To that end, "[a]n officer conducting a search is entitled to qualified immunity if 'a reasonable officer could have believed' that the search was lawful 'in light of clearly established law and the information the searching officer[] possessed.'" *Groh v. Ramirez*, 540 U.S. 551, 566 (Kennedy, J., dissenting) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Thus, at this stage in the litigation, the operative question is whether "the summary judgment record shows" that the defendants "knew or reasonably should have known" that they entered a constitutionally protected area. *Pray v. City of Sandusky*, 49 F.3d 1154, 1159 (6th Cir. 1995).

The right to be free from warrantless entry into a private residence and its curtilage was clearly established at the time of Quandavier's death. As the Supreme Court has recognized, "[n]o reasonable officer could claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional." *Groh*, 540 U.S. at 564. That conclusion is no different if the door to a private residence is unlocked or even ajar. *See, e.g.*, *United States v. McClain*, 444 F.3d 556, 563–64 (6th Cir. 2005) (assuming that an open door did not justify warrantless entry into a home). We recently recognized as much in a case involving material facts nearly identical to those here. *See Richards*, 788 F. App'x at 330–31 (finding that the right to be free from warrantless entry into the unlocked foyer and stairwell of a quadplex apartment was clearly established in 2014). Because, as already discussed, there is evidence that the exterior side door of 1751 Chase Avenue opened into the interior of Quandavier's apartment and not a common hallway, we find that Quandavier's right to be free from the defendants' warrantless entry was clearly established.

There is also evidence from which a reasonable jury could find that the defendants should have known that they had entered a private residence. With respect to the exterior of the duplex, there were only two mailboxes to accompany the two separate entrances to the structure. The defendants acknowledge that the mailboxes were visible. The side entrance, moreover, was in a removed location and lacked multiple nameplates, doorbells, or apartment numbers. The exterior door itself also suggested a private interior: it was closed, had two locks, contained a privacy curtain, and was fortified by metal bars. Once inside, the doors in the foyer and along

the second floor were all without locks, apartment numbers, or knockers.  A coat rack greeted the defendants as they entered the second-floor landing and the windowsill just above the landing was lined with half-burned candles.  A cursory glance to the right would have also revealed a kitchen.  These are all facts from which a jury could find that the defendants should have known that they were in a private residence.

The defendants point to several facts supporting the reasonableness of their mistake.  It is undisputed, for instance, that the exterior door was unlocked and that most of the interior doors were closed.  Schneider and Scott also testified that, based on their experience, homes in the area are often divided into multiple apartment units accessible through one or more shared entrances.  A jury could find these facts persuasive and determine that the defendants' mistake was reasonable.  At this stage in the litigation, however, it is adequate that Hicks has presented evidence from which a reasonable jury could find that the defendants should have known they were in a private residence.  *See Pray*, 49 F.3d at 1160 (holding that "it is for the trier of fact to determine, based on the credibility of the evidence before it, at what point the officers knew or reasonably should have known" of their mistake).  Accordingly, we reverse the district court and deny qualified immunity to Scott, Moore, and Schneider.

2.

Hicks next argues that the district court erred in finding that Scott's use of deadly force was objectively reasonable.  She also contends that the right to be free from deadly force under the circumstances was clearly established at the time of Quandavier's death.  Because Scott's use of deadly force was an objectively reasonable response to having a rifle pointed at her face from five feet away, we affirm the district court's grant of qualified immunity to Scott.

The Fourth Amendment's prohibition against unreasonable seizures prohibits the use of excessive force.  *King v. Taylor*, 694 F.3d 650, 662 (6th Cir. 2012).  The test is one of objective reasonableness: "[T]he question is whether [an] officer[']s actions [were] 'objectively reasonable' in light of the facts and circumstances confronting [her]."  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  In assessing those circumstances, we consider three main factors: (1) "the severity of the crime at issue," (2) "whether the suspect pose[d] an immediate threat to

the safety of the officers or others," and (3) "whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight." *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005) (quoting *Graham*, 490 U.S. at 396). When an officer uses deadly force, the critical factor is whether the suspect presented an immediate danger to the officers or others. *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015). To that end, an officer's use of deadly force is only reasonable if she had "probable cause to believe that the suspect pose[d] [such] a threat." *Untalan*, 430 F.3d at 314.

As this court has often emphasized, the reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Chappell v. City of Cleveland*, 585 F.3d 901, 908 (6th Cir. 2009) (quoting *Graham*, 490 U.S. at 396). We may not substitute our own opinion of "proper police procedure for the instantaneous decision of the officer at the scene." *Boyd v. Baeppler*, 215 F.3d 594, 602 (6th Cir. 2000). Although the fact that a situation unfolds quickly "does not, by itself, permit [officers] to use deadly force," *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005), we must afford "a built-in measure of deference to [an] officer's on-the-spot judgment," *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

In the present case, Scott reasonably perceived an immediate threat to her safety when a rifle was pointed at her face from five feet away. Although "merely possessing a weapon" does not justify deadly force, *Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019), the reasonableness of an officer's asserted fear will often turn on whether an armed suspect pointed her weapon at another person, *see, e.g.*, *Boyd*, 215 F.3d at 599 ("[T]he issue that is material here is . . . whether [the suspect] pointed his weapon at the officers and thus posed an immediate threat to them."); *David v. City of Bellevue*, 706 F. App'x 847, 851 (6th Cir. 2017) ("The key fact . . . is whether [the suspect] had his gun pointed at the officers."); *Presnall v. Huey*, 657 F. App'x 508, 512 (6th Cir. 2016) ("Time and time again, we have rejected Fourth Amendment claims . . . when the officers used deadly force only after the suspect[] had aimed [her] gun[] at [them] . . . .").

In turn, if a suspect possessed a gun, we will generally deny qualified immunity only if there is a genuine dispute of fact as to whether the gun was pointed at someone. *See, e.g.*, *King*, 694 F.3d at 662–63 (denying qualified immunity based on dispute as to where gun was pointed); *Brandenbrug v. Cureton*, 882 F.2d 211, 215 (6th Cir. 1989) (same); *David*, 706 F. App'x at 851–52 (same).

Here, there is no genuine dispute that Quandavier pointed his rifle directly at Scott in the moments before he was shot. The defendants all testified that, as soon as the door started to open, they could see the rifle barrel pointed at Scott. Scott testified that the rifle was "pointed at [her] face," DE 36, Scott Dep., Page ID 435, a description consistent with the other defendants' accounts and her position just to the side of the elevated doorway. Schneider offered the most plaintiff-friendly description, stating that, as Quandavier "nonchalantly" panned the rifle from left to right "at waist level," it did not appear as though he was "picking out anyone in particular." DE 38, Schneider Dep., Page ID 783, 816–17. But whether Quandavier incidentally or deliberately pointed the rifle at Scott is of little relevance: either way, the record shows that, the moment the doorway opened, she was at the business end of a rifle. Quandavier may have had no ill intent when he pointed the rifle at Scott; the issue, however, "is whether a reasonable officer in [Scott's] shoes would have feared for [her] life, not what was in the mind of [Quandavier] when he turned [the corner] with [a] gun in his hand." *Bell v. City of East Cleveland*, No. 96-3801, 1997 WL 640116, at *3 (6th Cir. Oct. 14, 1997).

The threat perceived by Scott was further compounded by her close proximity to the rifle and lack of a viable escape route. Scott testified that the rifle was "a few feet" from her face when Quandavier opened the door, DE 36, Scott Dep., Page ID 433, and Schneider estimated that the end of the rifle was "five feet" or "[m]aybe a few feet" from Scott, DE 38, Schneider Dep., Page ID 828. Photographs and diagrams of the second-floor landing confirm that there was little space to maneuver and no obvious path for retreat. The same documents also show no readily available area where Scott could have taken cover. When, as here, it is undisputed that a suspect pointed a weapon at an officer and the officer was "backed up against a wall in [a] small []room" with "no ready means of retreat or escape," the use of deadly force is "clearly" justified. *Chappell*, 585 F.3d at 91; *see also Thornton v. City of Columbus*, 727 F. App'x 829, 837 (6th

Cir. 2018) (holding that "the undisputed manner in which [the suspect] was holding the [shotgun,] combined with the short distance between himself and the [o]fficers," made deadly force reasonable).

Hicks contends that Quandavier was disarmed before Scott fired her weapon. There is no dispute that Moore reached for the barrel of the rifle as it emerged from the doorway. The record also supports that Moore placed his left hand on the barrel before Scott fired her weapon. There is no evidence, however, that Quandavier was disarmed before Scott acted. To the contrary, the most a jury could infer is that the two actions—Moore gripping the barrel and Scott firing her weapon—occurred simultaneously. Still, even if the dispute was genuine, it would not be material. An officer may use deadly force when a "confrontation unfold[s] in such rapid succession that he [has no] chance to realize that a potentially dangerous situation ha[s] evolved into a safe one." *Mullins*, 805 F.3d at 766–67; *see also Untalan*, 430 F.3d at 315–16 (finding officer still justified in shooting suspect a "few seconds" after the suspect lost his weapon). Here, the longest estimation of the *entire* encounter was "[t]wo to three seconds, at most." DE 38, Schneider Dep., Page ID 787. Thus, even if Quandavier had been disarmed at some point during the encounter, it would still have been reasonable for Scott to act on her initial perception of a threat.

Finally, Hicks argues that Scott's use of deadly force was unreasonable because she placed herself in harm's way and then failed to warn Quandavier before firing. Hicks has a point: Scott may have been negligent or worse in creating the situation when she entered the apartment and failed to announce herself. Under the "segmented analysis" employed by this court, however, "[w]e do not scrutinize whether it was reasonable for the officer to create the circumstances." *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017); *see also Dickerson v. McClellan*, 101 F.3d 1151, 1160–62 (6th Cir. 1996) (refusing to consider officers' unannounced entry when weighing the reasonableness of deadly force). Instead, the only inquiry that matters is whether, in the "moment" before using deadly force, an officer reasonably perceived an immediate threat to her safety. *Thomas*, 854 F.3d at 365. Here, as already discussed, Scott reasonably perceived such a threat. And it is for this same reason that Scott was not required to give a warning. When the "hesitation involved in giving a warning could readily

cause such a warning to be [the officer's] last," then a warning is not feasible. *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994). It was not feasible for Scott—unexpectedly confronted with the barrel of a rifle from five feet away—to give a warning before firing her weapon.**[2]**

Accordingly, because the district court properly found that Scott's use of deadly force was objectively reasonable, we affirm the court's grant of qualified immunity to Scott.

3.

Hicks argues that the district court erred in finding that the defendants were not deliberately indifferent to Quandavier's serious medical need. She further maintains that Quandavier's right to adequate medical care was clearly established at the time of his death. The issue is an easy one with respect to Scott and Moore: because both officers refrained from administering aid only after they made a prompt request for outside medical support, they were not deliberately indifferent to Quandavier's serious medical need. The issue is more difficult as to Schneider, but we ultimately conclude that he is also entitled to qualified immunity on the medical needs issue.

The Fourteenth Amendment requires adequate medical care for persons "injured while being apprehended by the police." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). An injured suspect, however, is only entitled to relief if a government official acts with "deliberate indifference to [her] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The deliberate indifference standard contains both an objective and subjective

---

**[2]**Hicks argues that it is disputed whether Quandavier was holding a rifle at all when he encountered the defendants. She points to a statement by Robert Boggs, who was staying with Quandavier the night he was shot, alleging that he neither saw Quandavier with a rifle before the shooting nor saw a rifle at the scene shortly after the shooting. Boggs, however, was not with Quandavier immediately before the shooting and did not, in fact, witness the shooting. We have explained that an inconsistent account of a deadly force encounter, when rendered by a person not physically present for the encounter, does not create a genuine dispute of fact. *See Chappell*, 585 F.3d at 914 (finding no genuine dispute of fact when, contrary to the officers' accounts, three persons outside a home did not hear the officers announce their presence inside the home); *see also Presnall*, 657 F. App'x at 512 ("An explained absence of evidence in this context is not evidence of absence."). The fact that Boggs did not see the rifle "does not refute" the officers' testimony that Quandavier was carrying a rifle when he was shot—"it establishes only" that Boggs did not see the rifle *after* the shooting. *Chappell*, 585 F.3d at 914. The testimony, at most, creates "metaphysical doubt as to the material facts," which cannot defeat a motion for summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

component.  *Phillips v. Roane Cty.*, 534 F.3d 531, 539 (6th Cir. 2008).  First, under the objective component, a suspect must show a "sufficiently serious" medical need.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  An injury "so obvious that even a layperson would easily recognize the necessity for a doctor's attention" satisfies the seriousness requirement because such an injury presumptively gives rise to "a substantial risk of serious harm."  *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 899 (6th Cir. 2004).  Second, under the subjective component, a suspect must show that (1) an official was aware of facts from which she could have inferred a substantial risk of serious harm to the suspect, (2) she in fact drew such an inference, and (3) she nevertheless disregarded the known risk.[3]  *Comstock v. McCray*, 273 F.3d 693, 703 (6th Cir. 2001).

Here, with respect to the objective component, it is unclear exactly when Quandavier stopped experiencing a serious medical need.  The defendants argue—and the district court agreed—that Quandavier was no longer experiencing a serious medical need when Loreaux offered to provide first aid.  They reason that, because Quandavier was already dead when Loreaux inquired with Schneider, he was no longer at risk of suffering serious harm and thus did not "actually need[] medical care."  DE 52, Slip Op., Page ID 1358 (quoting *Mattox v. Edelman*, 851 F.3d 583, 598 (6th Cir. 2017)).  The defendants are right that a dead person no longer has a serious medical need; however, it is uncertain whether Quandavier was dead.

We do know that Quandavier did not die instantly.  Schneider testified that, after Loreaux moved the rifle down the hall, he could see that Quandavier was "clearly . . . struggling for his life."  DE 38, Schneider Dep., Page ID 833.  He also perceived a need to "administer first aid" and described blood "squirting everywhere."  *Id.* at 707, 817.  And relatively little time elapsed—slightly more than thirty seconds—between when the shot was fired and when Loreaux offered to help.  Although Loreaux testified that Quandavier appeared lifeless from twelve feet

---

[3]The defendants argue that a more demanding standard—intent to harm—should apply to Hicks's medical treatment claim.  It does not.  The "intent to harm" standard applies only in those situations where "deliberation was not possible," *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 603 (6th Cir. 2005), and an officer was required to make an "instant judgment," *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998), such as during a high-speed vehicle chase.  It does not apply when, as here, the initial chaos of an armed encounter has passed and an officer has time to "consider the potential consequences of [her] conduct."  *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002) (quoting *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 373 (9th Cir. 1998)); *see also Estate of Owensby*, 414 F.3d at 603 (finding "no question" that "actual deliberation" was possible during the six-minute period between when officers shot the suspect and paramedics arrived).

away, and the coroner found that Scott's bullet "transected," or cut through, "[t]he ascending aorta," the exact point of Quandavier's death cannot be determined from the record. DE 44-12, Coroner Report, Page ID 1280. We thus assume for the purpose of our qualified immunity analysis that Quandavier was still alive and experiencing a serious medical need when Loreaux offered his assistance.

Scott and Moore are nevertheless entitled to qualified immunity. Scott and Schneider radioed requests for medical assistance immediately after the shooting. Moore was standing within feet of both officers when they made those requests. As we recently reaffirmed, "[w]hen police injure a person while apprehending him, they generally satisfy the Fourteenth Amendment by summoning medical care and not intentionally or recklessly delaying his access to it." *Wilkerson v. City of Akron*, 906 F.3d 477, 483 (6th Cir. 2018) (citing *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1097–98 (6th Cir. 1992)). Although Moore did not summon paramedics himself, it would have been reasonable for him to rely on the calls by Scott and Schneider. And, even if Moore was unaware of those calls, there is no evidence that he subjectively perceived the extent of Quandavier's injuries or otherwise prevented him from receiving first aid. Accordingly, neither Scott nor Moore was deliberately indifferent.

Schneider is also entitled to qualified immunity, but his conduct requires closer analysis. To begin, it is undisputed that Schneider recognized Quandavier's need for medical attention, called for paramedics, and intended to administer aid in the moments after Quandavier was shot. It is also undisputed that Schneider perceived a need to ensure his and the other officers' safety by handcuffing Quandavier and sweeping the third floor. These actions—including Schneider's choice to cease attempts at first aid in favor of securing the scene—were appropriate under the circumstances. *See Thomas*, 854 F.3d at 367 ("[A]n officer does not act with reckless disregard when he immediately summons help and then focuses on his own safety.").

At issue, rather, is whether Loreaux's recollection of Schneider rejecting his help *before* Schneider had left to secure the third floor is enough to show that Schneider knew of and disregarded Quandavier's serious medical need. *See Scozzari v. Miedzianowski*, 454 F. App'x 455, 466 (6th Cir. 2012) ("[T]he obligation to provide adequate medical care to an injured detainee is not discharged merely by promptly calling for assistance, but extends to ensuring that

medical responders are able to access the victim without unreasonable delay."); *Wilkerson*, 906 F.3d at 483 (holding that officers may not "intentionally or recklessly delay[]" access to medical care). Hicks contends that it is. True enough, Schneider believed that Quandavier was alive and needed medical attention in the seconds after he was shot. And Schneider then discouraged Loreaux from providing aid by telling him that Quandavier was no longer breathing. This all occurred before Schneider was pulled away from the scene to sweep the third floor. But these facts alone do not show deliberate indifference.

To reach that conclusion, we would need to assume that, because Schneider thought that Quandavier was alive immediately after being shot, Schneider still held that belief when Loreaux offered to administer first aid. The record, however, does not support that inference. In the moments after the officers encountered Quandavier and his rifle, the scene was chaotic. Schneider's attention was divided between comforting Scott, securing an uncontrolled environment, and attending to Quandavier. He would have seen only what Loreaux described as a "lifeless body." DE 42, Loreaux Dep., Page ID 1050. And Loreaux never informed Schneider that he had medical training, nor did he share his opinion that bleeding deaths typically take longer. Thus, although Quandavier may still have been alive, and although Schneider may have been negligent in failing to check for vital signs before turning down Loreaux's offer of assistance, there is no evidence that Schneider still believed that Quandavier was alive by the time Loreaux made the inquiry. Accordingly, Schneider was not deliberately indifferent.

B.

The district court, having found no underlying constitutional violations, entered summary judgment in favor of the City of Cincinnati on Hicks's municipal liability claims. *See Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) ("There can be no [municipal] liability . . . without an underlying constitutional violation."). The district court did not analyze the merits of the claims and, on appeal, the parties offer only cursory briefing. Because, as discussed above, there is evidence from which a reasonable jury could find that Scott, Moore, and Schneider violated Quandavier's Fourth Amendment rights, we vacate the district court's entry of summary judgment in favor of the City of Cincinnati and remand for the district court to consider the municipal liability claims consistent with our other holdings. *See Gradisher v. City of Akron*,

794 F.3d 574, 587 (6th Cir. 2015) (reversing on underlying constitutional claim and remanding for consideration of municipal liability "in the first instance").

C.

The district court relied on its excessive force analysis to find that Scott was also entitled to statutory immunity on Hicks's state-law battery claim. The court did not address the issue of statutory immunity as to Hicks's wrongful death claim because it concluded that Hicks failed to raise the claim in her response brief. Hicks argues that she adequately opposed summary judgment on her wrongful death claim and that, based on the merits of her related constitutional claims, the defendants should be denied statutory immunity as to both of her state-law claims.

As an initial matter, Hicks preserved her wrongful death claim for appeal. In general, "[i]ssues not presented to the district court but raised for the first time on appeal are not properly before the court." *J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1488 (6th Cir. 1991). Although Hicks's response brief was not a paragon of clarity, a fair reading of the brief evidences that she opposed summary judgment on both her state-law battery *and* wrongful death claims. The relevant section heading of her brief, for example, stated that, "[t]he evidence in the record demonstrates genuine issues of fact as to Defendants' liability on plaintiff's state law *claims*." DE 44, Pl.'s Mem. on Summ. J., Page ID 1154 (emphasis added). She then went on to recognize that the defendants had moved for summary judgment on her "seventh [i.e., wrongful death] and eighth [i.e., battery] causes of action." *Id.* It is true that, after laying out and addressing the Ohio immunity standard, Hicks only referenced her battery claim and inexplicably alluded to an "assault" claim. *Id.* at 1155. But it was still evident that she intended to oppose summary judgment on *both* the wrongful death and battery "claims." *Id.* at 1154.

The defendants, in turn, are entitled to statutory immunity from all but the wrongful death claim. Under Ohio law, state employees are immune from suit unless an exception applies. Ohio Rev. Code § 2744.03(A)(6). One exception provides that an employee is susceptible to suit if she acts "with malicious purpose, in bad faith, or in a wanton or reckless manner." *Id.* § 2744.03(A)(6)(b). As relevant here, an employee acts in a reckless manner if she displays

"conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Argabrite v. Neer*, 75 N.E.3d 161, 164 (Ohio 2016). "When federal qualified immunity and . . . immunity under § 2744.03(A)(6) rest on the same questions of material fact, we may review the state-law immunity defense 'through the lens of the federal qualified immunity analysis.'" *Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (quoting *Chappell*, 585 F.3d at 907 n.1).

It follows that, because Scott's use of deadly force was reasonable, and there is no evidence that Moore or Schneider used any force against Quandavier, each is entitled to statutory immunity from the state-law battery claim. *See, e.g.*, *Chappell*, 585 F.3d at 916 n.3 (holding that an officer's objectively reasonable use of deadly force necessarily precludes the abrogation of immunity under Ohio Rev. Code § 2744.03(A)(6)(b)). Similarly, because none of the defendants acted with deliberate indifference to Quandavier's serious medical need, each is entitled to statutory immunity from the wrongful death claim in so far as it is based on the care Quandavier received immediately after the encounter. *See, e.g.*, *Ewolski*, 287 F.3d at 517 (awarding statutory immunity under Ohio Rev. Code § 2744.03(A)(6)(b) based on an earlier finding that the officers had not acted with deliberate indifference). However, because we deny Scott, Moore, and Schneider qualified immunity from the unlawful entry claim, statutory immunity is likewise unavailable for the wrongful death claim in so far as that claim is based on the defendants' warrantless entry into Quandavier's apartment. *See, e.g.*, *Jones v. Sandusky Cty.*, 541 F. App'x 653, 667 (6th Cir. 2013); *cf. also Gardisher v. City of Akron*, 794 F.3d 574, 587–88 (6th Cir. 2015).

Because the district court did not consider whether, without statutory immunity, the wrongful death claim would survive summary judgment, we remand that claim so that the district court may "determine whether to exercise supplemental jurisdiction," and, if so, whether the claim should proceed to trial. *Veneklase v. Bridgewater Condos, L.C.*, 670 F.3d 705, 717 (6th Cir. 2012).

IV.

Based on the foregoing, we reverse the district court's grant of qualified immunity to Scott, Moore, and Schneider on Hicks's unlawful entry claim; affirm the district court as to Hicks's excessive force, deliberate indifference, and state-law battery claims; and remand for the district court to evaluate the municipal liability and wrongful death claims consistent with this opinion.