NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0321n.06

Case No. 20-1878

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>DONALD SCOTT TUCKER, Personal<br>Representative of the Estate of Clifford Tucker,<br><br>    Plaintiff-Appellant,<br><br>v.<br><br>MARQUETTE COUNTY, MICHIGAN; KEITH<br>ROMBACK,<br><br>    Defendants-Appellees.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>FILED<br>Jul 07, 2021<br>DEBORAH S. HUNT, Clerk<br><br>ON APPEAL FROM THE<br>UNITED STATES DISTRICT<br>COURT FOR THE WESTERN<br>DISTRICT OF MICHIGAN<br><br>OPINION</td></tr>
</table>

BEFORE: STRANCH, BUSH, and READLER, Circuit Judges.

JOHN K. BUSH, Circuit Judge. Deputy Keith Romback shot and killed Clifford Tucker after responding to Tucker's suicide threat. Danger from the threat had escalated when Tucker picked up a shotgun and slowly moved within a few feet of Romback. Although the shotgun was pointed toward the floor at the moment Romback shot, Tucker advanced while shouting, waving his free arm, and ignoring Romback's commands to drop the gun. The question before us is whether in those circumstances Romback's decision to shoot was clearly reasonable. We hold that it was. Therefore, we affirm.

I.

On the morning of June 9, 2016, Clifford Tucker called his doctor's office complaining about severe back and shoulder pain and threatening to commit suicide. The office called the

Marquette County Sheriff's department, which dispatched Deputy Keith Romback to Tucker's house. Romback had seen Tucker the day before after responding to a 911 call from Tucker about his pain medication being stolen. When Romback arrived at Tucker's house on June 9th, he first spoke to Tucker on the porch, with his bodycam recording video and sound. Romback explained that he was there because Tucker made threats to the hospital. Tucker initially denied making any threats, told Romback to stay away from him, threw down the coffee mug he had been holding, crossed his arms, and said, "you want to come in? You come over top of me." He then removed his glasses and said, "I don't give a fuck no more, all right? You get the hell off my property." Romback told him to be careful, to which Tucker replied, "be careful, your ass." Romback then called for backup, before Tucker continued, "get the hell off my property now. If I want to hurt myself, there's not a fucking thing you can do about it."

After several more demands for Romback to leave, Tucker moved from the doorway to sit on his couch next to a gun cabinet. Romback followed him inside but remained near the doorway. He told Tucker, "Cliff, I'm just here to help you. I'm not here to bust your balls. I'm not here to do anything." Tucker again told Romback to go away. So Romback said, "I'll go away if you answer one thing . . . was that you that called the hospital?" Tucker then admitted to calling the hospital, and Romback said, "and that's why I'm here, Cliff." To that Tucker replied, "I don't care why you're here." Romback then asked, "well, what did you think would happen when you called the hospital?" Tucker responded, "I don't give a fuck. When I get ready to blow my fucking head off, there's nothing you can do about it." Romback replied, "I know that, Cliff," and Tucker again told him to "get out." Then Romback checked on the status of his backup, requesting that it be expedited.

After hearing Romback's request to expedite his backup, Tucker got up from the couch and walked a few feet to his bedroom. Romback stepped further into the house to follow Tucker, but before Romback entered the bedroom, Tucker emerged in the doorway holding a shotgun with both hands. He swung the gun to his right so that it briefly pointed at Romback before pointing it at the floor. Romback drew and aimed his gun at Tucker, repeatedly ordering, "Clifford, don't! Clifford, don't!" Tucker held the gun with his right hand by its butt, with the barrel facing the floor. He told Romback, "I'm asking you to leave." Romback yelled, "put it down, Clifford! Clifford! Clifford, don't!" Tucker yelled in reply, "shoot me then! Shoot me! Shoot me!" Romback kept ordering Tucker, "Clifford, don't." But Tucker continued to yell, "shoot me," waved his left arm, and moved forward slowly toward Romback. As he was moving forward, Romback fired four shots, hitting Tucker in the chest. Tucker collapsed. He died from his wounds later that day.

Tucker's estate sued Romback, Marquette County, and Mark Ulvila, another officer who arrived on the scene after Tucker was shot. The complaint alleged excessive-force, deliberate-indifference, and illegal-entry claims against Romback and a failure-to-train claim against the county. On the parties' stipulation, the district court dismissed the deliberate-indifference claim and all claims against Ulvila. The court later dismissed the remaining claims on summary judgment. It granted qualified immunity to Romback on the excessive-force claim, holding that he did not violate a constitutional right in using deadly force against Tucker. And because the court found that Romback did not violate a constitutional right, it held that Marquette County was also not liable. Tucker's estate appeals the grant of summary judgment to the county and to Romback on its excessive-force claim. We begin with the latter.

II.

We review the grant of summary judgment to Romback de novo. *Wright v. City of Euclid*, 962 F.3d 852, 864 (6th Cir. 2020). Romback is entitled to summary judgment if there is no genuine dispute of a material fact and he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Typically, at the summary-judgment stage we construe the evidence in favor of the non-moving party. *Wright*, 962 F.3d at 864. But where, as here, the relevant facts are recorded on video, we view those facts as the video depicts. *Cunningham v. Shelby County*, 994 F.3d 761, 765 (6th Cir. 2021). If any uncertainty remains, we construe it in favor of the non-moving party. *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017).

The district court granted summary judgment to Romback on qualified-immunity grounds. Romback is entitled to qualified immunity either if he did not violate a constitutional right or if the right was not clearly established at the time of the alleged violation. *Cunningham*, 994 F.3d at 764. We can begin with either prong. *Id.* Like the district court, we begin (and end) with the first.

Tucker's estate argues that Romback violated a constitutional right by using excessive force when he shot Tucker. Whether an officer used excessive force turns on what is objectively reasonable based on all the circumstances. *Hicks v. Scott*, 958 F.3d 421, 435 (6th Cir. 2020). Deadly force is only reasonable when there is probable cause that a suspect poses an immediate threat to the officer or to others. *Id.* In determining if such a threat existed, we afford "a built-in measure of deference to [an] officer's on-the-spot judgment." *Id.* (alteration in original) (quoting *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002)). Possession of a gun alone does not create that threat. *Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019); *see also Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017) ("[W]e do not hold that an officer may shoot a suspect merely because he has a gun in his hand."). Depending on the circumstances, however, that threat

making deadly force reasonable may still exist when a suspect does not aim his gun at an officer. *Jacobs*, 915 F.3d at 1040.

For example, in *Thomas*, we held that there was a sufficient threat to justify the use of deadly force when a suspect had a handgun but did not point it at the officer. 854 F.3d at 366. The officer, while responding to an ongoing burglary, shot and killed a suspect running toward him who was holding the handgun. *Id.* We reasoned that the suspect, who was initially about forty feet from the officer and closing fast, could "raise and fire a gun with little or no time for an officer to react," so an officer could reasonably perceive a threat to his life. *Id.*

Similarly, in *Livermore ex rel Rohm v. Lubelan*, we held that it was reasonable for an officer to shoot a suspect who held a rifle even if the suspect did not aim the gun at another officer. 476 F.3d 397, 405 (6th Cir. 2007). Facts significant to our holding included the suspect's proximity to other officers "while armed with a rifle, his prior violent behavior, and his continued refusal to surrender and face arrest." *Id.*

Analogous circumstances were present in *Thornton v. City of Columbus*, where we held that a sufficient threat existed from a suspect who held, but did not aim, a shotgun while looking at and walking toward officers, ignoring their commands to drop the gun. 727 F. App'x 829, 831, 837 (6th Cir. 2018). We reasoned that the "deadly threat" the suspect posed "could have easily and quickly transformed into deadly action in a split-second" and that the officers did not have to wait for him to raise his gun before using deadly force. *Id.* at 837–38.

Romback's use of force fits squarely in line with those cases. To begin, there are no disputes of material fact preventing summary judgment. Romback's bodycam video provides a clear picture of what happened save for two things: whether, when Romback shot him, Tucker had his hand near the trigger area of the gun or on its butt; and whether the gun was resting on the

floor. We construe both in the light most favorable to Tucker's estate. *See Latits*, 878 F.3d at 544. But even so construed, Romback's actions were reasonable based on all the circumstances.

Romback was confronted by a potentially suicidal man who did not want Romback in his home. When Romback first arrived, Tucker threw down his coffee mug, took his glasses off, crossed his arms, and told Romback: "you want to come in? You come over top of me," "get the hell off my property," and "if I want to hurt myself, there's not a fucking thing you can do about it." Tucker was clearly angry and confrontational, and he did not want Romback there. When it became clear to Tucker that Romback would not leave after Romback called to check on the status of his backup, he went into another room and picked up a shotgun. He briefly pointed the muzzle of the gun at Romback when he swung it to his side. Then, repeatedly ignoring Romback's commands of "don't" and "put it down," Tucker yelled for Romback to shoot him as he moved forward slowly and waived his free arm wildly. All told, Romback faced an agitated, potentially suicidal man who was closing the already short distance between them, ignoring commands, and holding a shotgun, all the while yelling for Romback to shoot him. Based on the totality of those circumstances, and consistent with our caselaw, it was reasonable for Romback to use deadly force. He had probable cause to believe that he faced an immediate threat to his safety, especially considering the deference owed to his on-the-spot judgment. *See Hicks*, 958 F.3d at 435. Like the officers in *Thomas*, *Livermore*, and *Thornton*, Romback did not have to wait for Tucker to aim his gun.

Tucker's estate resists that conclusion, arguing that this case is different for two main reasons: first, because Tucker's hand was not on the trigger of the gun, he could not quickly have aimed it at Romback; and second, because Romback already had his gun pointed at Tucker, he could pull the trigger quicker than Tucker if Tucker did take aim. Neither of those arguments,

both made with the benefit of hindsight, renders Romback's actions unreasonable. The extra time that it would have taken for Tucker to move his hand to the trigger before taking aim does not mean that he could not "have easily and quickly transformed" his deadly threat into deadly action. *Thornton*, 727 F. App'x at 837. And Romback was not required to bet on having a quicker trigger finger than Tucker just because he already had his gun aimed. *See id.* at 838. The Fourth Amendment does not require an officer to make that gamble.

In a similar vein, Tucker's estate argues that, because Tucker's gun was not pointed at Romback, our cases require the reasonableness question to go to a jury. But the cases on which the estate relies had disputes of material fact as to whether a suspect aimed a gun at the officers or posed no serious threat at all. *See, e.g.*, *King v. Taylor*, 694 F.3d 650, 662–63 (6th Cir. 2012); *Bouggess v. Mattingly*, 482 F.3d 886, 890 (6th Cir. 2007). Importantly, in those cases, the totality of the circumstances—assuming the gun was not aimed at the officers—was insufficient to have clearly posed a threat of harm. For example, in *King*, officers shot a suspect, who had allegedly made threats earlier in the day, after they found him sleeping on a couch in his house. 649 F.3d at 654. From outside the house, the officers woke him by announcing their presence and then shot him through the window after they claimed he pointed a gun at them. *Id.* But the forensic evidence suggested that the suspect did not in fact point the gun at the officers. *Id.* at 662–63. If that were so, then the officers would have shot a man who simply had a gun; the surrounding circumstances added little to the threat he posed.

But that is not the case here. Instead, just as in *Thomas*, *Livermore*, and *Thornton*, the totality of the circumstances present here—including the close surroundings, Tucker's steps toward Romback, him ignoring Romback's commands, his angry or threatening statements and unpredictable gesticulation, and his potential ability to aim the gun quickly, among others—made

the threat such that the use of deadly force was reasonable. And, just as in those cases, we can resolve the legal question of reasonableness. *See Thornton*, 727 F. App'x at 837 (explaining that, after viewing the facts in the required light, the reasonableness question is a legal one).

III.

Turning to the municipal-liability claim against Marquette County, Tucker's estate argues only that the district court erred because it wrongly concluded that Romback did not commit a constitutional violation. Any other argument is forfeited. *See United States v. Montgomery*, 998 F.3d 693, 698 (6th Cir. 2021). Therefore, because we hold that the district court did not err in concluding that Romback did not violate a constitutional right, we also hold that it did not err in dismissing the municipal-liability claim against the county.

IV.

Accordingly, we affirm the district court's grants of summary judgment.