*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0315P (6th Cir.)
File Name: 00a0315p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

Nos. 99-5325/5326
UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

    *v.*

JAVIER SAUCEDO (99-5325);
REFUJIO HERNANDEZ
(99-5326),
        *Defendants-Appellants.*

Nos. 99-5325/
5326/5411

No. 99-5411
UNITED STATES OF AMERICA,
        *Plaintiff-Appellant,*

    v.

JORDAN KEY,
        *Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 98-20074—Bernice B. Donald, District Judge.

Argued: June 14, 2000

Decided and Filed:  September 12, 2000

Before:  KRUPANSKY, NORRIS, and SUHRHEINRICH,
Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  Daniel L. Johnson, Memphis, Tennessee, for Appellant.   Thomas L. Parker, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for United States of America.  Bruce I. Griffey, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE WESTERN DISTRICT OF TENNESSEE, Memphis, Tennessee, for Appellee.  **ON BRIEF:**  Daniel L. Johnson, Memphis, Tennessee, Mary C. Jermann, WAMPLER & PIERCE, Memphis, Tennessee, for Appellants.  Thomas L. Parker, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for United States of America.  Thomas J. Gibson, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE WESTERN DISTRICT OF TENNESSEE, Memphis, Tennessee, for Appellee.

_____

**OPINION**

_____

KRUPANSKY, Circuit Judge.  In case numbers 99-5325 and 99-5326, respectively, the defendants-appellants Javier Saucedo ("Saucedo") and Refujio Hernandez ("Hernandez") have each contested his sentence, and Hernandez has challenged his conviction, for cocaine conspiracy offenses. Saucedo has contended (1) that the sentencing judge should have accorded him a "minimal participant" offense level reduction and (2) erroneously quantified the narcotics chargeable against him.  Hernandez has asserted that the district court should have suppressed the evidence against him because his detention, and subsequent seizure of currency

the suggested bases for departure are adequately discussed in the Guidelines.  The Guidelines have already incorporated a weighted allowance for entering a timely guilty plea in U.S.S.G. § 3E1.1(b) which reduces the assigned base offense level.  The consideration of health problems is discouraged by U.S.S.G. § 5H1.4.  Aberrant behavior is listed as a valid reason for a departure in U.S.S.G. Chapter 1, part A § 4(d) (policy statement), but the district court properly determined that Key's participation in at least five cocaine transactions cannot be considered aberrant.  *United States v. Andruska*, 964 F.2d 640, 644-45 (7th Cir. 1992).  There is nothing unusual or exceptional about Key's case.

Accordingly, the sentence of Saucedo, and the conviction and sentence of Hernandez, are **AFFIRMED.**  However, because the district court abused its discretion in departing from the applicable guideline range in sentencing Key without first analyzing whether the case was outside the heartland of cases considered by the Guidelines, the decision of the trial court is **REVERSED** and the matter is **REMANDED** to the district court for re-sentencing within the guideline range of 97 - 121 months.

the Guidelines taken as a whole nor did the court compare the instant case to "heartland" cases.[15]

There is nothing in the record to indicate to this court that the instant case lies outside of the "heartland" of cases contemplated by the Sentencing Guidelines. Indeed, each of

---

[15]The monologue oral ruling of the district court reveals no awareness of the need for the case to lie outside the heartland of typical cases which it encounters:

> With regard to all of these objections that Mr. Gibson [Key's attorney] made on behalf of his client, as I said before, the person assumes the risk of engaging in certain conduct and has to accept the consequence of that conduct.

> The court doesn't find that Mr. Key's medical condition standing alone is a grounds for departure.

> Similarly, while Mr. Key is a first offender, I don't believe that the single act of aberrant behavior is appropriate under the circumstances of this case. But I think taking into account and aggregating all of those things, I believe that there is a basis for a slight departure in Mr. Key's case. I do remember his case quite vividly and the day of trial when we were ready to go to trial and the court [at] Mr. Gibson's request went into chambers and Mr. Key ultimately decided to plead guilty, it was after that announcement, I think, that other defendants then requested time to talk with Mr. Parker and made independent decisions to plead guilty. Who knows how much effect that had on it.
> I don't -- don't find that he provided particular assistance to the government but I do believe that his actions on that date were a substantial factor in the other defendants making a decision to -- to enter a plea.

> So the court finds that all of these matters taken to an aggregate provides a basis for a slight departure, but the health condition, the timing and his history prior to this event.

> But I will tell you, Mr. Parker [representing the government], it is not going to be much of one because I just find this was very serious, that he was very involved in that, I don't know how much of this occurred prior to this point, but I will depart slightly in this case.

from him, purportedly violated the Fourth Amendment and/or the Fourteenth Amendment. In case number 99-5411, plaintiff-appellant the United States of America has charged that the district court abused its discretion by departing downward in sentencing of defendant-appellee Jordan Key ("Key"). The government has argued that the district court erroneously failed to consider if the circumstances of Key's case excluded it from the "heartland" of cases contemplated in the Guideline Manual of the United States Sentencing Commission.

On April 9, 1998, a reliable confidential informant telephoned Officer Joseph Hoing of the Memphis Police Department's Organized Crime Unit who was assigned to the special Drug Enforcement Agency ("DEA") Task Force. The confidential informant advised Hoing that defendant Hernandez would arrive that same day at the Memphis, Tennessee airport on a Continental Airlines flight at 8:45 p.m. from Houston, Texas, with a return ticket for Houston the following day. Cognizant that Houston was a major cocaine source city, Hoing concluded that Hernandez's travel activities comported with the standard practices of narcotics and/or currency couriers, warranting investigation. The confidential informant advised that Hernandez would occupy seat 4B in the aircraft.

Hoing and a fellow agent on the DEA Task Force, Shelby County Sheriff's Deputy Anita Tarwater ("Tarwater"), went to the Memphis airport to meet the 8:45 Continental flight from Houston. From a distance, the two officers observed the occupant of seat 4B, defendant Hernandez. As he exited the aircraft and moved through the airport terminal, he repeatedly peered over his shoulder and otherwise appeared anxious. The subject toted a carry-on bag but claimed no luggage. He placed two calls from a public telephone, then waited curbside outside the terminal. Ultimately, a white 1997

Chevrolet Blazer with co-defendants Thomas Davidson ("Davidson")[1] and Key, arrived to meet Hernandez.

The two police officers, supported by back-up agents, followed the Blazer to the Hilton Hotel, 5069 Sanderlin Avenue, Memphis. They observed the Blazer stop near a parked green 1997 Mercury Cougar which bore a Texas license tag; that vehicle later proved to be registered to Hertz Rent-A-Car in San Antonio, Texas. Hernandez departed the Blazer and entered the Cougar, which was operated by co-defendant Saucedo. Saucedo and Hernandez then followed the Chevrolet to a parking lot near the Gables Apartments, an exclusive gated residential community.

As Officer Hoing observed the scene from his unmarked squad cruiser, Hernandez, Saucedo, Key, and Davidson each exited his respective vehicle and surveilled the area. The four men began walking across the street in the direction opposite the apartment complex. Subsequently, the four suspects turned and walked into the complex, and approached 2845 Morning Lake Drive, unit no. 104. Hoing exited his vehicle to observe Apartment 104 as well as the parking lot.

Subsequently, Davidson exited unit 104 and re-entered the Blazer and drove away. Surveillance operatives followed him to his mother's residence in Raleigh, Tennessee, a nearby suburb. Davidson entered and remained inside his mother's house for only several minutes thereafter, returning immediately to the Gables Apartments. He reentered Apartment 104 with a brown shoulder bag which he carried from the Blazer. Approximately thirty minutes later, the four target individuals left the apartment. Hernandez and Saucedo re-entered the Mercury, whereas Davidson and Key returned to the Blazer. As the two vehicles approached the parking lot's exit, officers surrounded them. The constables ordered

---

[1]Davidson is not involved in the instant consolidated appeals.

purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case. However, the Commission believes that such cases will be extremely rare.

U.S.S.G. § 5K2.0 commentary (emphases added).

The statutory and Guidelines provisions prompted the United States Supreme Court to demand that:

Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline. To resolve this question, the district court must make *a refined assessment* of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing. Whether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are matters determined in large part by comparison with the facts of other Guidelines cases.

*Koon v. United States*, 518 U.S. 81, 98 (1996) (emphasis added).

Before the district court may grant a downward departure, it "*must*, after considering the 'structure and theory of both relevant individual guidelines and the Guidelines taken as a whole,' decide whether it is sufficient to take the case out of the Guideline[s'] heartland.'" *United States v. Coleman*, 188 F.3d 354, 359 (6th Cir. 1999) (*en banc*) (quoting *Koon v. United States*, 518 U.S. at 96) (emphasis in original). In the instant case, the district court made no inquiry regarding the structure and theory of relevant individual guidelines nor of

the district court, that contention must be deemed waived. *See* FED. R. CRIM. P. 12(b)(3) (dictating that a motion to suppress evidence "must be raised prior to trial.")  The Sixth Circuit has emphasized that it is "categorically without jurisdiction to hear appeals of suppression issues raised for the first time on appeal." *United States v. Yannott*, 42 F.3d 999, 1005 (6th Cir. 1994) (*quoting United States v. Crismon*, 905 F.2d 966, 969 (6th Cir. 1990) (*per curiam*)).

Finally, the panel has considered the government's challenge to the downward departure in Key's sentencing. A district court's decision to depart downward from the Sentencing Guidelines range is reviewed for an abuse of discretion. *See Koon v. United States*, 518 U.S. 81, 96-100 (1996).

A court's discretion to depart downwards is governed by statute:

> The Court shall impose a sentence of the kind, and within the range [determined by the guidelines] *unless* the Court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

18 U.S.C. § 3553(b) (emphasis added).

The guidelines applicable at the time of Key's sentencing mentioned the statutorily-created possibility for downward departure in the comment to § 5K2.0, wherein:

> *The Commission does not foreclose the possibility of an extraordinary case that*, because of a *combination* of such characteristics [those not normally relevant to a departure from the guidelines] or circumstances, *differs significantly from the "heartland" cases covered by the guidelines* in a way that is important to the statutory

all occupants out of the stopped vehicles and interrogated each individual separately.

When DEA Special Agent Brian Chambers asked Key if he had any weapons, Key replied that a gun was on the floor of the Blazer.  Detectives confiscated a .9 millimeter handgun from within the vehicle.

Davidson stated that he resided in Apartment 104.  He claimed that Hernandez was a "friend" from Texas, although he only knew Hernandez's first name (Refujio), and experienced difficulty pronouncing it.  Davidson falsely denied his earlier visit to his mother's home.  He also alleged that he had never before met Saucedo and did not know how Hernandez traveled  from the airport to his (Davidson's) domicile, contrary to Hoing's eyewitness attestations that Davidson had personally accompanied Hernandez from the airport and had driven him to a parked automobile operated by Saucedo.

Saucedo informed interrogating detectives that he had leased the Mercury in San Antonio, Texas, to drive to Memphis to "hang out" with Hernandez.  However, when questioned, Saucedo knew the full name of neither Hernandez nor Davidson.  Saucedo disclosed that he had stayed at the Hilton Hotel while in Memphis.  A consent search of the Mercury disclosed that its back seat had been unbolted in the standard fashion of a courier vehicle, enabling the clandestine storage of narcotics or bank notes in the area beneath the seat. A trained narcotics detection canine was used to alert the officers to the Mercury's rear seat.[2]

Upon inquiry, Hernandez initially advised the officers that he had flown to Memphis to pay a personal visit to his friend "Thomas" (Davidson), although he did not know the last name of his purported social host.  However, he ultimately

---

[2]The dog, Majik, had been schooled in the olfactory detection of cocaine, methamphetamine, marijuana, and heroin.

stated that Davidson had brought a sizeable sum of cash to the apartment in a shoulder bag, which Davidson purportedly owed Hernandez for an unspecified personal debt. Hernandez had secreted the currency[3] inside his underwear. Hernandez verbally consented to Hoing's removal of the treasury bills from inside his clothing. Hoing testified that the currency was packaged in two separate rubber-banded bundles. Hoing and a fellow constable tallied the seized notes, which totaled $14,200. The drug-sniffing dog was attracted to the money, even though officers had inserted it inside an envelop which they deposited under a parked automobile, confirming the past proximity of the bills to a controlled substance.

A subsequent warrant search of Apartment 104 (Davidson's residence) produced 2.478 kilograms of cocaine powder contained in two packages hidden beneath clothing inside a laundry basket, plus an additional 222.5 grams of cocaine powder from inside a briefcase secreted within a bedroom closet.

Further investigation disclosed that Hernandez and Saucedo had supplied cocaine to Davidson on at least four other occasions and that Key distributed the cocaine for Davidson once the drug arrived in Memphis. The first of these transactions occurred during January of 1998, when Davidson agreed to purchase one kilogram of cocaine at the cost of $22,000, apparently on consignment. Approximately two weeks later, Hernandez returned to Memphis, in connection with the second known transaction. Davidson at that time paid for the first kilogram of cocaine, and Hernandez gave Davidson two more kilograms. The third known transaction occurred on March 8, 1998, when Davidson and Key traveled to Houston with $40,000. They met with Hernandez and returned to Memphis with three kilograms of cocaine.

---

[3] In response to Hoing's query regarding the amount of cash tendered by Davidson, Hernandez replied, "about a bundle." Hoing recognized the term "bundle" as standard narcotics trade jargon.

automobile, ordered him out, and interrogated him, possessed the requisite reasonable articulable suspicion that he might be involved in criminal activity; and whether the scope of that stop and interrogation was reasonably related to the circumstances which justified the detention. The facts of record, related above, reflected that, *at the time of the stop*, the officers had much more than a mere hunch that narcotics trafficking was occurring; in fact, virtually no innocent explanation could have accounted for all of the activities and circumstances witnessed by the investigators. Possessing a valid rationale for the vehicular stop, the officers were then permitted to order the occupants to exit those vehicles. *Maryland v. Wilson*, 519 U.S. 408, 410 (1997).

The overall circumstances, bolstered by the immediate discovery of a firearm in Key's possession, justified questioning of the suspects, including Hernandez, about activities which, taken together, strongly indicated narcotics dealing. The false and evasive responses given by the detainees supplied additional justification for further questioning. *See United States v. Hill*, 195 F.3d 258, 270-73 (6th Cir. 1999), *cert. denied*, 120 S. Ct. 1207 (2000). Hernandez's Fourth Amendment rights, as explicated in *Terry* and its progeny, were not impinged by the faulted stop, questioning, and/or consensual removal of cash from his clothing.

In the alternative, Hernandez has protested, for the first time on appeal, that the authorities initially targeted him solely by reason of his Hispanic heritage, in affront to his Fourteenth Amendment equal protection guarantees. *See United States v. Avery,* 137 F.3d 343 (6th Cir. 1997). However, Hernandez has failed to prove, by requisite direct, circumstantial, or statistical evidence, that he was a target of racial profiling. *Id*. at 355-58. Instead, Hernandez has offered only speculation that the lawmen were inspired by his ethnicity to inaugurate an investigation of his travels. Moreover, because Hernandez neglected to frame his equal protection theory within his evidence suppression motion in

*United States v. Cortez*, 449 U.S. 411, 417 (1981). The two-part *Terry* "objective reasonableness" paradigm inquires "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances that justified the interference in the first place." *Terry*, 392 U.S. at 20.

Hernandez has posited that the confidential informant's tip, even if reliable, did not warrant the initiation of a narcotics investigation, because nothing related by the confidential informant directly indicated criminal activity. Rather, the confidential informant merely told Officer Hoing that Hernandez would be flying from Houston to Memphis and returning to Houston the next day. Hernandez has maintained that a one-day visit from a drug source city to a metropolis confronting a narcotics problem does not, standing alone, support an objective reasonable suspicion that the traveler is a drug mule.

Although a mere "hunch" triggered by the confidential informant's intelligence would not suffice to justify an investigatory detention of the subject simply because he fit a drug courier profile, *see United States v. Tolbert*, 692 F.2d 1041, 1047 (6th Cir. 1982), the Fourth Amendment did not preclude Officer Hoing, and his colleagues, from discretely investigating that "hunch" by means short of a *Terry* stop. The agents non-intrusively surveilled Hernandez and his cohorts from a distance, and lawfully gathered additional information from outside public and private sources. Until the policemen stopped Hernandez's automobile, they had not invaded his protected rights of physical integrity, property security, and/or freedom of movement. *See United States v. Avery*, 137 F.3d 343, 352-53 (6th Cir. 1997) (instructing that a suspect has no Fourth Amendment protections during any *pre-contact stage* of a criminal investigation, because he had yet not been seized or searched).

The salient *Terry* issues presented herein are whether the officers, at the time that they stopped Hernandez's

Finally, in the fourth known transaction, Hernandez and Saucedo delivered two kilograms of cocaine to Davidson and Key in Memphis, Tennessee, between March 12 and 14, 1998.

On April 21, 1998, a grand jury charged the four confederates with possession of, and conspiring to possess cocaine, with intent to distribute, and conspiring to distribute cocaine, all in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846 (count one); and aiding and abetting each other in the possession of cocaine with intent to distribute, in offense to 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (count two).[4] Additionally, the indictment charged Davidson and Key with the knowing and intentional carriage or use of a firearm during and in relation to a drug trafficking crime, and aiding and abetting each other in that offense, in affront to 18 U.S.C. § 924(c) and 18 U.S.C. § 2.

On June 4, 1998, Hernandez moved to suppress all evidence against him charging that it resulted from a search that violated his Fourth Amendment rights. Following an evidentiary hearing, a magistrate judge issued a Report and Recommendation ("R & R") advising denial of the petition. Hernandez objected to the R & R. The district court, on August 7, 1998, overruled Hernandez's objections and adopted the R & R.

On September 8, 1998, Davidson executed a written Fed. R. Crim. P. 11 plea agreement, whereby he pleaded guilty to counts one and two of the indictment. On September 11, 1998, Key also pleaded guilty to the first and second charged offenses. Later the same day, Saucedo and Hernandez each pleaded guilty to count one of the indictment pursuant to oral plea agreements. Hernandez conditioned his plea of guilty upon the outcome of an appeal of the trial court's denial of his

---

[4] Previously, on April 10, 1998, the four defendants had been charged with cocaine distribution offenses via a criminal complaint filed by Agent Tarwater.

suppression petition.  On February 25, 1999, the trial judge sentenced Hernandez to the custody of the United States Bureau of Prisons for 121 months,[5] to be followed by four years of supervised release.  On March 3, 1999, Hernandez noticed a timely appeal.

On February 25, 1999, the district court presided over a sentencing hearing for Key.  The Presentence Investigation Report concerning Key contained a base offense level of 32 pursuant to USCG § 2D1.1, together with a two-level enhancement for the presence of a firearm, producing an adjusted offense level of 34.  Key received a two-level reduction for acceptance of responsibility, leaving a total offense level of 32.  During the sentencing hearing, because the defendant had no criminal history, the government agreed to the application of the "safety valve" provision of U.S.S.G. § 2D1.1(b)(6), resulting in 30 points and a guideline range of 97 to 121 months.[6]

The court also addressed three asserted bases for downward departure: that pursuant to U.S.S.G. § 1A, note 4(d), his behavior constituted "aberrant behavior"; that he "triggered" the other defendants to change their pleas when he changed his plea to guilty, thereby creating a mitigating circumstance not adequately considered by the sentencing commission, pursuant to U.S.S.G. § 5K2.0; and that a physical disability, in that he had only one kidney, half of which had been removed after a bullet injury, made him subject to abuse in a

---

[5]Hernandez's offense level (30), coupled with his criminal history category (III), yielded a guidelines imprisonment range of 121 to 151 months.  U.S.S.G. Chap. 5, Pt. A.

[6]In order for the trial court to grant Key the downward departure of U.S.S.G. § 2D1.1(b)(6), it ruled that the firearm, for which Key was assessed a two-level enhancement under U.S.S.G. § 2D1.1(b)(1), was not present at the criminal transaction for purposes of U.S.S.G. § 2D1.1(b)(6). The government did not object to or appeal this two-level reduction under U.S.S.G. § 2D1.1(b)(6).

conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  *Illinois v. Wardlow*, 120 S. Ct. 673, 675 (2000) (*citing Terry*, 392 U.S. at 30).  The Court has explained:

> While "reasonable suspicion" is a less demanding standard than probable cause[13] and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  The officer must be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity.[14]

*Id*. at 675-76 (*quoting Terry*, 392 U.S. at 27).

The "touchstone of the Fourth Amendment is reasonableness."  *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (*quoting Florida v. Jimeno*, 500 U.S. 248, 250 (1991)).  The "reasonableness" determination hinges upon objective factors, not the actual subjective motivation of the officer(s) involved. *Bond v. United States*, 120 S. Ct. 1462, 1465 & n.2 (2000); *Whren v. United States*, 517 U.S. 806, 813 (1996).  The "reasonableness" of an "articulable suspicion" is assessed with reference to the totality of the relevant circumstances.

---

[13]"'Probable cause' denotes 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Painter v. Robertson*, 185 F.3d 557, 569 (6th Cir. 1999) (citations omitted).

[14]"The historical facts and circumstances pertinent to the 'reasonable suspicion' inquiry pose pure factual issues, whereas the ultimate 'reasonable suspicion' query constitutes a mixed issue of law and fact." *Painter v. Robertson*, 185 F.3d 557, 568 (6th Cir. 1999) (citations omitted).  Mixed law and fact conclusions are scrutinized *de novo*. *Paul Revere Life Ins. Co. v. Brock*, 28 F.3d 551, 553 (6th Cir. 1994).

distance courier, Saucedo knowingly contributed a vital service to the distribution cartel with respect to the four kilograms of cocaine which he transported. Because Saucedo failed to carry his burden of proving the alleged mitigating factor by a preponderance of the evidence, *United States v. Lloyd*, 10 F.3d 1197, 1220 (6th Cir. 1993), no clear error tainted those findings. *See United States v. Williams*, 940 F.2d 176, 180 (6th Cir. 1991). Manifestly, Saucedo was not a "minimal" or a "minor" participant in the trafficking of the four kilograms of cocaine for which he was sentenced. *United States v. Roper*, 135 F.3d 430, 434-35 (6th Cir.), *cert. denied*, 524 U.S. 920 (1998); *United States v. Neal*, 187 F.3d 639 (Table), 1999 WL 551367, at *6 (6th Cir. 1999) (*per curiam*), *cert. denied*, 120 S. Ct. 801 (2000).

Next, Hernandez has attacked the district court's denial of his motion to suppress evidence. He argued below, without success, that law enforcement personnel stopped, investigated, and interrogated him outside the boundaries of the Fourth Amendment,[12] thus the fruits of that interaction, including the drug money consensually removed from his trousers, were inadmissible against him. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Court ruled that "an officer may, consistent with the Fourth Amendment,

_____

role could not be described as minimal." U.S.S.G. § 3B1.2, comment. (n.3).

"The Sentencing Commission's Notes and Commentary to the guidelines is authoritative and binding upon the courts unless such are inconsistent with the Constitution, a federal statute, or the guidelines themselves." *United States v. Landers*, 39 F.3d 643, 646 n.7 (6th Cir. 1994) (*citing Stinson v. United States*, 508 U.S. 36, 38 (1993)).

[12]The Fourth Amendment recites, in relevant part, that "[t]he right of the people to be secure in their persons . . . and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV.

prison environment, which he also asserted as a basis for a downward departure under U.S.S.G. § 5K2.0.

While the court ruled that none of Key's asserted bases for a downward departure, "standing alone," were sufficient to merit sentencing leniency, it decided, over the government's objection, that the collective conditions provided a basis for departing from the Guidelines. The district court thereupon departed downward from the minimum guideline range of 97 months to impose a sentence of 84 months, followed by a four-year period of supervised release. On March 23, 1999, the government filed its timely appeal.

On October 30, 1998, Saucedo objected, in writing, to the "relevant conduct" cocaine quantification contained in his Presentence Investigation Report ("PSR"), as well as his probation officer's failure to recommend a "minimal participant" sentencing reduction. During his February 25, 1999 sentencing hearing, Saucedo abandoned his challenge to the PSR's "relevant conduct" recommendation,[7] but continued to press his "minimal participant" mitigation request. Saucedo had confessed to having completed two

_____

[7]During the February 25, 1999 sentencing proceedings, Saucedo's attorney requested a recess to discuss the "relevant conduct" objection with his client, indicating that they may "be striking our objection to the relevant conduct issue." Following that recess, the following colloquy transpired:

> **THE COURT:** All right. The relevant conduct objections as to all parties have been [resolved]?
>
> **MR. PARKER [AUSA]:** That's my understanding as to both Mr. Saucedo and Mr. Key, the relevant conduct portions in the Presentence Report[s] have been agreed to.
>
> **THE COURT:** Okay. Then let's proceed with the sentencing. And I will start with Mr. Javier Saucedo.

At no point thereafter did Saucedo's lawyer renew any objection to his PSR's "relevant conduct" calculation.

cocaine deliveries to Memphis for Hernandez, one in March and other in April, 1998, which totaled four kilograms.[8]  The PSR charged Saucedo only with those four kilograms.  After the lower court rejected Saucedo's "minimal participant" motion, it condemned him to 63 months in federal prison,[9] to be followed by three years of supervised release.  On March 3, 1999, Saucedo initiated a seasonable appeal.

Considering the assignments of error asserted by Saucedo, this court finds that he knowingly waived his charged error that the trial court had attributed an unsubstantiated amount of cocaine to his activity.[10]  Consequently, that challenge is

---

[8]Saucedo testified that Hernandez had agree to pay $1,000 for each kilogram of cocaine which Saucedo transported to Memphis, although Saucedo did not know the actual weight of the cocaine packages which he delivered.  Hernandez paid Saucedo $2,000 for his March 1998 shipment.  Although Saucedo had not received payment for his April 1998 delivery, the cocaine seized from Davidson's apartment following the April 9, 1998 arrests, which was contained in two intact bundles hidden together in a laundry basket, weighed in excess of two kilograms.

[9]Saucedo's offense level (26), matched with his criminal history category (I), produced a guidelines incarceration range of 63 to 78 months.  U.S.S.G. Chap. 5, Pt. A.

[10]"The government bears the burden of proving the quantity of drugs chargeable to a defendant for sentencing purposes by a preponderance of the evidence.  Like other factual findings, the sentencing court's drug quantity determination is reviewable only for clear error." *United States v. Gessa*, 57 F.3d 493, 496 (6th Cir. 1995) (citations omitted).  "Clear error" exists when "although there is evidence to support [the finding], the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

On review, Saucedo has faulted the sentencing judge's observation, on the record, that Saucedo probably would have consummated additional future cocaine deliveries if he had not been arrested in April 1998.  Additionally, Saucedo has claimed that the district court factually erred by stating that he had made "multiple" deliveries.  However, Saucedo admitted that he had made two trips from Texas to Memphis as a narcotics

forever foreclosed, and cannot be resurrected on this appeal.  *United States v. Olano*, 507 U.S. 725, 733 (1993).

Additionally, Saucedo has urged that the district court, in rejecting his motion for a four-point "minimal participant" reduction to his offense level, clearly erred by finding that his role in the implicated criminal activity was more than minimal.[11]  The district court pronounced that, as a paid long-

---

courier for Hernandez, which is more than one and hence "multiple."  At any rate, neither of those remarks evinced any error in sentencing, because the trial court adopted the PSR's recommendation to charge him only with the four kilograms which he had personally delivered.  Accordingly, no "plain error," or *any* error, which could have prejudiced Saucedo supported those unreserved objections, and thus they are non-cognizable on review.  Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 734 (1993);*United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998), *cert. denied*, 526 U.S. 1030 (1999).

[11]The Sentencing Guidelines posit:

Based on the defendant's role in the offense, decrease the offense level as follows:

(a)  If the defendant was a minimal participant in any criminal activity, decrease by **4** levels.

(b)  If the defendant was a minor participant in any criminal activity, decrease by **2** levels.

In cases falling between (a) and (b), decrease by **3** levels.

U.S.S.G. § 3B1.2 (boldface in original).

The official commentary to U.S.S.G. § 3B1.2 stipulates that the reduction for "minimal" participants "is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group.  Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant."  U.S.S.G. § 3B1.2, comment. (n.1).  The commentary further postulated that "[f]or purposes of §3B1.2(b), a minor participant means any participant who is less culpable than most other participants, but whose