NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0066n.06

No. 22-3251

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

CHRISTOPHER MICHAEL COOPER, Administrator
of the Estate of Deaunte Bell-McGrew,

    Plaintiff-Appellant,

v.

CITY OF COLUMBUS, OHIO; MATTHEW BAASE;
JOHN NAREWSKI,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF OHIO

OPINION

Before: GIBBONS, GRIFFIN, and STRANCH, Circuit Judges.

GRIFFIN, Circuit Judge.

Columbus Police Officer John Narewski briefly and chaotically wrestled with Deaunte Bell-McGrew over access to a handgun in the backseat of a car. Fearing for Narewski's safety, his partner, Columbus Police Officer Matthew Baase, shot and wounded Bell-McGrew. Narewski immediately exited the vehicle, turned, and fatally shot Bell-McGrew, all within about five seconds of Baase's shot. Bell-McGrew's estate chiefly contends the officers' use of deadly force violated the Fourth Amendment. The district court found that the officers' conduct was reasonable and therefore held they were entitled to qualified immunity. We agree and affirm.

I.

A.

The events at issue in this lawsuit all occurred within a few moments in rapid succession. On the evening of October 29, 2015, the City of Columbus Police Department's Community Response Team deployed officers to patrol for and "arrest individuals engaged in felony criminal activity." Officers Baase and Narewski were assigned portions of the city's east side, including the Amberly Square Apartments. That complex "was notorious for robberies," "known [for] drug trafficking," and had "several incidents of gunshots."

At about 9:20 pm, the officers drove around the area and came across a legally parked car. Officer Baase parked his cruiser just beyond the car, activated his spotlight, and determined three individuals were in it—two in the front and one in the back. They decided to commence a "consensual encounter," meaning, in Basse's words, when "a uniformed officer has an interaction with the member of the public that is in no way a detention." Officer Narewski described their approach this way: "We were just walking up there to see what was going on. Initially prior to exiting the car, we didn't have any reasonable suspicio[n] or . . . think that any criminal activity was afoot other than we saw a car parked with some people. We were going to walk up and see what they were doing."

Narewski approached the driver and Baase the front passenger. As Narewski walked up, he "could smell the odor of burnt marijuana in the air." He determined the smell came only from that vehicle because he "did not observe any other individuals or vehicles that could have been the source of the odor of marijuana." But he could not tell "if it was from someone that had been standing outside the vehicle, or from inside the vehicle." So he asked the driver, Lovita Cosby, "if they were smoking marijuana," to which she replied, "you mean this very moment?" "[B]oth

kind of chuckled and laughed," and Narewski took the response to be an admission of recent marijuana use.

Officer Baase then observed the passenger in the backseat behind the driver, Deaunte Bell-McGrew, "reaching down between his legs with his right hand." Baase directed Bell-McGrew to keep his hands where Baase could see them. But he did not—both Baase and Narewski saw Bell-McGrew "moving around a lot," "reaching down toward the floor board," and "dipping down with his right hand." This time, Officer Narewski directed Bell-McGrew "a couple of times" to keep his hands in view. Bell-McGrew again did not comply.

Things escalated quickly from this point. Narewski opened the rear-driver's-side door because he had concluded Bell-McGrew either "had a weapon or was attempting to hide some form of contraband," told Bell-McGrew to "calm down," and asked him to step out of the car. Bell-McGrew asked, "[f]or what, officer? What did I do?" and yelled "you've got no f--king right." He again reached down to the floor. Narewski grabbed Bell-McGrew's left hand, and Bell-McGrew became more agitated, yelling again "f--k you, you don't have any right." Bell-McGrew turned toward Narewski, at which point Officer Baase saw a handgun in Bell-McGrew's pocket. Baase yelled "gun" to inform Narewski of its presence.

"After [a] matter of seconds," according to Baase, Bell-McGrew "with both of his hands pulled violently away from Officer Narewski and reached *for* the right pocket, in which the pistol was in." (Emphasis added). This "pulled" Narewski "inside the vehicle on top of" Bell-McGrew because Narewski was still holding Bell-McGrew's left wrist. Narewski's version is similar: "When my partner said 'gun,' [Bell-McGrew] dove into the car." "I'm not really sure if I got dragged in or went in on instinct, but my whole goal was to brace that left hand and try to get ahold

of [Bell-McGrew's] right hand to prevent him from getting the gun, or if he already had the gun, prevent him from using the gun."

The physical encounter quickly intensified inside the "pitch black" car. Narewski and Bell-McGrew were "actively fighting in the back seat" over Bell-McGrew's access to the handgun. As Narewski put it, "[w]e're in the back seat wrestling. My arm is probably up at some point, it's down, it's around. I'm trying to gain control of his body, so I don't get shot. That's my goal at that point, or my partner doesn't get shot." Plaintiff asserts that Narewski "never saw or felt Bell-McGrew reach for his pocket," but the record does not reflect this—at best, the record establishes Narewski was not sure where Bell-McGrew reached due to the scuffle's hectic nature.

The skirmish lasted just "a matter of seconds." Baase swiftly formed the belief that Bell-McGrew, who was "nose-to-nose" with Narewski, "was attempting to get ahold [of] and use that firearm against [Narewski] and [Baase]." So after Narewski "was able to push himself up and gather some space between himself and [Bell-McGrew]," Baase fired one shot at Bell-McGrew. Baase's bullet shattered the rear passenger window and struck Bell-McGrew between his neck and right shoulder.

Still inside the car, Officer Narewski felt "glass hit [his] face," saw "a gun shot in the window with lights coming through," and sat up. He did not know if Bell-McGrew "ha[d] the gun" or "had shot," or if it was Officer Baase who fired his weapon. The car's driver, who was still inside, also did not know who fired that shot. Narewski determined that he had "to get out of the car and fall back" for his own safety.

Narewski stepped backwards out of the car, drew his gun, and shot and killed Bell-McGrew within "[l]ess than five seconds" of Baase's shot. Narewski testified that he saw Bell-McGrew exit the car, "crouch[] down," and "quickly turn[]" with "sharp, abrupt movements" towards him.

So, although he "never saw a gun" after exiting the vehicle, Narewski "fire[d] multiple shots from [his] weapon." Narewski cannot say for certain whether he shot before or after Bell-McGrew had turned. Officer Baase similarly testified that Bell-McGrew was exiting the car when shot by Narewski. Other officers who arrived on scene after the shooting testified, however, that Bell-McGrew was inside the car.

The fatal shot entered Bell-McGrew's left temple from the rear. Additional shots struck Bell-McGrew in the back of his left shoulder, left wrist, and right arm. Plaintiff's expert witness, Jeremy Bauer, Ph.D., an accident reconstructionist, thus concluded "Deaunte was seated in the left rear passenger seat of the vehicle with the back, left side of his body facing Officer Narewski when Officer Narewski fired the five additional shots that struck and ultimately killed Deaunte."

Finally, we note record evidence suggests that at some point Bell-McGrew may have said something to the effect of "chill out" or "I'm getting out." The individual in the front passenger seat, Luis Corchuelo, told police in a later-prepared police report that Bell-McGrew might have made these comments sometime during the incident.

## B.

The administrator of Bell-McGrew's estate, plaintiff Christopher Cooper, asserts multiple claims against defendants Baase and Narewski: unreasonable seizure in violation of the Fourth Amendment both by initially stopping Bell-McGrew and then using deadly force; and wrongful death and survivorship under Ohio law. He also brings a municipal lability claim against the City of Columbus under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Following discovery, the district court granted summary judgment in defendants' favor on all claims. It held that Officer Narewski had reasonable suspicion sufficient to conduct an investigatory stop of Bell-McGrew, and that the officers' use of deadly force was objectively

reasonable, and therefore concluded neither defendant unreasonably seized Bell-McGrew in violation of the Fourth Amendment. Because it concluded there was no constitutional violation, the district court similarly granted judgment in the City of Columbus's favor on plaintiff's *Monell* claim. And it found that Ohio statutory immunity barred plaintiff's state law claims against Baase and Narewski. Finally, when resolving defendants' motion for summary judgment, the district court granted in part and denied in part plaintiff's motion to file a sur reply. Plaintiff timely appeals each of these decisions.

## II.

The first issue in this case is whether Officers Baase and Narewski are entitled to qualified immunity for plaintiff's Fourth Amendment unreasonable seizure claims. Qualified immunity shields public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). It is not a "mere defense to liability"; the doctrine provides "*immunity from suit*." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). This immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," "protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted). A "plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011). To do so, he must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735 (internal quotation marks omitted). The district court concluded plaintiff failed to demonstrate a violation of a constitutional right, and we review that decision de novo. *Sutton v. Metro. Gov't of Nashville & Davidson Cnty.*, 700 F.3d 865, 871 (6th Cir. 2012).

A.

We begin with plaintiff's claim that Officer Narewski's initial investigatory stop of Bell-McGrew was unlawful.[1]  "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  An officer may conduct an investigatory stop—commonly referred to as a *Terry* stop—without running afoul of the Fourth Amendment if he has a reasonable suspicion that criminal activity is afoot.  *See Terry v. Ohio*, 392 U.S. 1, 30–31 (1968).  This is a "quite low" standard, "less demanding" than the familiar probable-cause standard, which itself is easier to satisfy than the preponderance-of-the-evidence standard.  *McCallister*, 39 F.4th at 373.  More than just a "hunch" is required, *Terry*, 392 U.S. at 27, but there need be only "a moderate chance of finding evidence of wrongdoing," *McCallister*, 39 F.4th at 373 (citation omitted).

Whether an officer has reasonable suspicion to conduct an investigatory stop depends upon the totality of the circumstances, "even if each individual factor is entirely consistent with innocent behavior when examined separately."  *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008) (citation omitted).  We consider "the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred."  *Id.*  "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information

---

[1]Due to Bell-McGrew's active resistance, Officer Narewski was not able to pat him down for weapons; accordingly, this appeal does not present the often-related issue of whether an officer may frisk an individual upon a showing of reasonable suspicion that the person searched may be armed and dangerous.  *See United States v. McCallister*, 39 F.4th 368, 373 (6th Cir. 2022).  To the extent plaintiff contends Narewski's entering the car with Bell-McGrew became the "frisk," there is "little question" that a frisk would be justified—it was known by that point that Bell-McGrew had a handgun and was reaching for it.  *Id.* at 376 (citation omitted).

available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (internal quotation marks omitted). *Terry* stops are thus permissible when, "[b]ased upon [this] whole picture the detaining officers . . . have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). We judge reasonable suspicion from the moment of the seizure. *Terry*, 392 U.S. at 22.

Officer Narewski seized Bell-McGrew when he opened the rear passenger door, and at that time, he had a particularized and objective basis to do so. First, Officer Narewski was in an area well-known for criminal activity. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (an area's high-crime nature is a "relevant contextual consideration[] in a *Terry* analysis"). Second, we have "long held that officers have the required probable cause when they detect the odor of illegal marijuana coming from the vehicle," *United States v. Brooks*, 987 F.3d 593, 599–600 (6th Cir. 2021) (collecting cases), which Narewski smelled when he walked up to the car. Third, Officer Narewski observed Bell-McGrew make numerous movements with his hands in the dark backseat contrary to instructions. Such gestures "made in response to police presence may also properly contribute to an officer's suspicions," *United States v. Caruthers*, 458 F.3d 459, 466 (6th Cir. 2006) (collecting cases), especially when done "after being told to stop moving," *United States v. Coker*, 648 F. App'x 541, 544 (6th Cir. 2016) (collecting cases). Indeed, we recently noted that the smell of marijuana in a car and a backseat passenger's furtive movements support *probable cause* of illegal activity. *See Brooks*, 987 F.3d at 600. Here, the circumstances, in their totality, satisfy *Terry*'s lower standard of reasonable suspicion.

In addition to being justified at inception, Officer Narewski's stop was, as it must be, "reasonably related in scope to the circumstances." *United States v. Blair*, 524 F.3d 740, 750 (6th Cir. 2008). "[R]oadside encounters between police and suspects are especially hazardous, and that

danger may arise from the possible presence of weapons in the area surrounding a suspect." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). Recognizing as such, we held in *United States v. Street* that it is permissible for an officer to grab an individual's arm when the officer suspects he is reaching for a weapon. 614 F.3d 228, 233 (6th Cir. 2010). So too here.

Plaintiff contends we should conclude otherwise because, he mainly claims, Officer "Baase testified that he did *not* smell marijuana." But that is not what the record establishes—Officer Baase testified only that he smelled "an odor . . . but [he] couldn't determine that it was marijuana." This testimony does not create a genuine dispute of material fact as to whether Officer Narewski smelled marijuana, particularly because Narewski's testimony is buttressed by evidence in the record, including his initial conversation with the driver about marijuana. *Cf. Jordan v. Howard*, 987 F.3d 537, 546 (6th Cir. 2021) ("[A]n explained absence of evidence . . . is not evidence of absence." (citation omitted)).

Nor do the officers' motivations, the consensual nature of the encounter, evidence of marijuana found after the shooting, or the legal conclusions of plaintiff's expert alter our analysis. Narewski's and Baase's charge to look for "felony criminal activity" as members of the Community Response Team—i.e., their "subjective motivation"—is irrelevant when conducting this objective inquiry. *United States v. Saucedo*, 226 F.3d 782, 789 (6th Cir. 2000).[2] Certainly, the encounter began consensually because the officers observed no unlawful conduct; but even innocent conduct, by itself or in combination with other permissible acts, can "provide the basis for a showing of probable cause." *United States v. Sokolow*, 490 U.S. 1, 9 (1989) (citation

---

[2]Plaintiff separately insinuates that Officer Narewski racially profiled individuals in the past and therefore must have stopped Bell-McGrew on account of his race. There are two problems with this: legally, his subjective motivation does not matter, *see Saucedo*, 226 F.3d at 789; and factually, the only thing that is in the record is that the City of Columbus Police Department found "unfounded" such a complaint against Narewski.

omitted); *see also United States v. Belakhdhar*, 924 F.3d 925, 928 (6th Cir. 2019) ("Though individual datapoints may portray entirely innocent conduct . . . our cases teach that the overall scatterplot may give rise to reasonable suspicion."). We acknowledge that the only physical evidence of marijuana found by the officers was a "small baggie" of it on the person of the front passenger, Luis Corchuelo, and that there is no direct evidence establishing Bell-McGrew used or possessed marijuana that day, but neither fact is of any moment—*Terry*'s reasonable-suspicion standard does not permit hindsight; rather, we view "the facts available to the officer at the moment of the seizure." 392 U.S. at 21–22. Finally, plaintiff's use-of-force expert, Melvin Tucker, does not agree that Narewski was justified in opening the car's door or grabbing Bell-McGrew's wrist, but it is our task—not Tucker's—to decide whether Narewski's actions were reasonable under the circumstances. *See Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017).

For these reasons, we affirm the district court's grant of summary judgment in Officer's Narewski's favor on plaintiff's Fourth Amendment *Terry*-stop claim.

B.

Next, plaintiff claims that both Baase and Narewski unreasonably used deadly force. "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1983). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). "Police officers routinely face 'tense, uncertain, and rapidly evolving' situations that force split-second judgments about the degree of force required"; we account for this by "evaluat[ing] the force used through the eyes of a

reasonable officer at the scene, not with 'the 20/20 vision of hindsight.'" *Reich v. City of Elizabethtown*, 945 F.3d 968, 978 (6th Cir. 2019) (quoting *Graham*, 490 U.S. at 396–97).

*Garner*'s "probable cause" standard governs whether an officer who uses deadly force violates the Fourth Amendment: an officer acts reasonably when deploying deadly force if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." 471 U.S. at 11. This objective test requires courts to judge the use of force from the perspective of a reasonable officer on the scene, "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. And we must apply a segmented approach to the analysis: we evaluate the "split-second judgments made immediately before the officer used allegedly excessive force." *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007) (internal quotation marks omitted). Discarded from this analytical overlay, then, is any "poor planning or bad tactics that might have created the circumstances that led to the use of force." *Reich*, 945 F.3d at 978 (internal quotation marks omitted). So too is plaintiff's "conceptually distinct" *Terry* claim. *See, e.g.*, *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996).

The Supreme Court has identified three non-exclusive factors that lower courts should consider in determining the reasonableness of force used: "(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officers or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Livermore*, 476 F.3d at 404. Our focus here is on the second factor—whether Bell-McGrew posed an immediate threat to the safety of the officers or others. *Graham*, 490 U.S. at 396. The threat factor is "a minimum requirement for the use of deadly force," meaning deadly force "may be used only

if the officer has probable cause to believe that the suspect poses a threat of severe physical harm." *Untalan v. City of Lorain,* 430 F.3d 312, 314 (6th Cir. 2005).

But before turning to that, we briefly note that, while the first factor weighs in plaintiff's favor given the lack of a severe crime, the third factor does not. Bell-McGrew was resisting Narewski's attempts to conduct a justified *Terry* stop. "The *Graham* test . . . is a totality of the circumstances test, so the court may consider this fact, even if it does not fit" *Graham*'s "arrest" "wording . . . precisely." *Id.* at 317. When an individual resists a police officer's effort to lawfully seize him, that fact tips in the police officer's favor. *See id.* ("[T]he [government]'s interest in seizing [an individual] with deadly force is greater because of [the individual]'s resistance to [the officer]'s efforts to restrain him."); *see also Davenport v. Causey*, 521 F.3d 544, 551 (6th Cir. 2008) ("More force is also proper, which could include deadly force, if the suspect was fighting with the police.").

With that observation, the crux of this claim is the threat factor. Both Officers Baase and Narewski shot Bell-McGrew after becoming aware of the handgun in his pocket. Because the "mere possession of a weapon is not sufficient to justify the use of deadly force," we require "additional indicia that the safety of the officer or others is at risk." *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F. 4th 468, 480 (6th Cir. 2022). This "often turn[s] on whether an armed suspect pointed her weapon at another person," *Hicks v. Scott*, 958 F.3d 421, 435 (6th Cir. 2020), but aiming a weapon is not a minimum requirement, *see Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019) ("[A]n officer need not face the business end of a gun to use deadly force."). In sum, probable cause exists when officers "could reasonably conclude that a suspect might fire a gun at them or use another dangerous weapon against them (even if they turned out to be wrong)." *Gambrel v. Knox Cnty.*, 25 F.4th 391, 405–06 (6th Cir. 2022) (collecting cases).

1.

Viewing the totality of the circumstances through the eyes of a reasonable officer in Baase's shoes, the district court correctly concluded Baase's shooting of Bell-McGrew did not violate the Fourth Amendment.

There is no disputing that Bell-McGrew had a gun and that the officers knew this. *Cf. Palma v. Johns*, 27 F.4th 419, 433 (6th Cir. 2022) ("The stronger the evidence showing that a person is armed, the more likely the use of lethal force is reasonable."). Plaintiff contends that is all Officer Baase knew, and therefore, "this is a case where the mere possession of a weapon does not permit the use of deadly force." The record does not bear this out.

We begin with Bell-McGrew's failure to follow the officers' numerous commands to keep his hands where they could see them and his furtive movements in the dark backseat. Contrary to plaintiff's assertion, the record evidence establishes, at a minimum, that Bell-McGrew reached for the pocket in which Baase observed a gun (including during the struggle with Narewski). When an individual "stops following officer commands and instead grabs a readily accessible firearm, an officer need not wait for the suspect to open fire on him before the officer may fire back." *Jordan*, 987 F.3d at 544 (alterations and internal quotation marks omitted). That Baase did not actually see Bell-McGrew touch the gun does not control. *See Untalan*, 430 F.3d at 315 ("[W]e do not think it wise to require a police officer, in all instances, to actually detect the presence of an object in a suspect's hands before firing on him." (citation omitted)).

It is also significant that Officer Baase observed a quickly escalating physical interaction between Bell-McGrew and Narewski, beginning with the "violent[]" movement by Bell-McGrew that pulled Narewski into the car. And he saw the two physically engaged, with Narewski struggling to prevent Bell-McGrew from accessing his pocket. "[C]lose proximity"

"compound[s]" an officer's threat perception, *see Hicks*, 958 F.3d at 436, and it is more than reasonable to conclude that Narewski's wrestling with Bell-McGrew in the small confines of the backseat amplified the situation. (And in our mind, the analysis is not impacted by whether they were "nose to nose" as Baase stated or positioned as Narewski said, with him on top of Bell-McGrew.)

In sum, Bell-McGrew's attempts to access his gun during the tight-quartered, fast-moving, and physical encounter rendered Baase's use of force reasonable. Officer Baase was not required to wait for Bell-McGrew to grip his handgun or point it at Narewski—"the deadly threat posed by [Bell-McGrew] could have easily and quickly transformed into deadly action in a split-second." *Thornton v. City of Columbus*, 727 F. App'x 829, 837 (6th Cir. 2018); *see also Reich*, 945 F.3d at 982 ("There is no rule that officers must wait until a suspect is literally within striking range, risking their own and others' lives, before resorting to deadly force."). Nor can we agree that "there was time for a warning because Baase testified that he waited to shoot until he had an unobstructed view." That was a fleeting moment into the "several seconds" of the encounter wherein Narewski separated himself from Bell-McGrew by a matter of inches. A warning in this instance was not feasible. *See Wilkerson v. City of Akron*, 906 F.3d 477, 483 (6th Cir. 2018).

For these reasons, the district court correctly concluded Officer Baase did not engage in excessive force in violation of the Fourth Amendment.

2.

There was also probable cause to believe that Bell-McGrew posed a serious threat of physical harm to Officer Narewski, thus justifying his separate use of deadly force. Officer Narewski faced a "tense, uncertain, and rapidly evolving" situation. *Graham*, 490 U.S. at 397. Only a matter of moments passed between Narewski's initial encounter with Bell-McGrew and

the shooting. And between those instants, Narewski saw Bell-McGrew fail to comply with requests to keep his hands in view, and observed him become agitated and tense. It quickly became physical after Baase announced Bell-McGrew had a gun—Bell-McGrew "dove into the car," and Narewski reasonably responded by trying to prevent access to that gun. It was dark and confined in the backseat as Narewski was physically struggling to restrain Bell-McGrew's hands. They were "actively fighting." Then there was a gunshot. Within a couple of seconds, Narewski exited the vehicle, drew his weapon, and shot and killed Bell-McGrew. Given the rapidly escalating nature of the encounter, Narewski's knowledge that Bell-McGrew was armed, Bell-McGrew's resistance, and the pair's hand-to-hand struggle, a reasonable officer could conclude that the gunshot Narewski heard came from Bell-McGrew and that Bell-McGrew still posed a threat of serious physical harm seconds later when Narewski fired his gun.

*Wilkerson* is illustrative. That matter also involved an encounter beginning with a *Terry* stop. 906 F.3d at 479–80. The man there kept moving his hands contrary to officers' instructions, the officers could not control his hands, and the man escaped. *Id.* at 480. Officers then tackled him and began wrestling him. *Id.* During the struggle, the man's gun somehow discharged. *Id.* He then ran off, only to be shot seconds later by one of the officers. *Id.* We concluded this did not violate the Fourth Amendment, holding that "a reasonable officer in this setting would believe himself in serious danger, knowing [the man] had a gun and knowing it had discharged." *Id.* at 483. We also discounted the argument that a warning was feasible given the split-second nature of the encounter and excused the fact that the man was running away from the officers—"[a]s far as [the shooting officer] knew, [the man] still had the once-discharged weapon (as the evidence shows he did), and nothing prevented [the man] from turning to fire upon the officers." *Id.* The same logic applies here.

Plaintiff tries to distance himself from *Wilkerson* because Bell-McGrew's gun remained in his pocket and never discharged. But as set forth, a reasonable officer in Narewski's shoes could conclude Bell-McGrew was attempting to access his gun, and given the circumstances of the chaotic and dark struggle, could conclude Baase's shot was, in fact, Bell-McGrew's.

Nor are we persuaded by plaintiff's suggestion that we should view Bell-McGrew's actions as defensive. It is true that Narewski never saw a weapon, but he certainly knew Bell-McGrew had one. And while Narewski was not sure whether Bell-McGrew reached for it during the scuffle, it was reasonable for him to infer that he did—Bell-McGrew made many furtive movements before Narewski entered the car, "dove" into the car immediately after it was announced that he had a gun, and then fended off Narewski's attempts to keep his hands contained once the struggle ensued. Bell-McGrew's "actual motives for his movements are not relevant," *Stevens-Rucker v. City of Columbus*, 739 F. App'x 834, 840 (6th Cir. 2018), rather "what matters is the reasonableness of the officer['s] belief," *Pollard v. City of Columbus*, 780 F.3d 395, 403 (6th Cir. 2015). And it was certainly reasonable for Narewski to believe Bell-McGrew was not only armed but attempting to grab the gun—an act of increasing aggression—while wrestling with Narewski. *See, e.g.*, *Davenport*, 521 F.3d at 551.

Plaintiff points to two facts after Baase fired his shot—Bell-McGrew's "chill out" and "I'm getting out" statements, and Bell-McGrew's positioning (seated in the car or exiting) when Narewski fired—but neither changes the conclusion that it was reasonable for Narewski to infer that Bell-McGrew was responsible for the shot being fired. When an officer acts within just a few seconds of reasonably perceiving a threat of serious physical harm, he is entitled to use deadly force, *see, e.g.*, *Mullins v. Cyranek*, 805 F.3d 760, 767 (6th Cir. 2015) (collecting cases), "even if in hindsight the facts show that the persons threatened could have escaped unharmed," *Untalan*,

430 F.3d at 315; *see also Hicks*, 958 F.3d at 436–37 (citation omitted) ("An officer may use deadly force when a confrontation unfolds in such rapid succession that he has no chance to realize that a potentially dangerous situation has evolved into a safe one." (alterations and internal quotation marks omitted)). Here, the ongoing struggle over Bell-McGrew's access to his gun and the shot fired show that Narewski's decision to respond with deadly force was not objectively unreasonable, without regard to whether Bell-McGrew was inside the car or not. Moreover, Bell-McGrew at least moved towards Narewski in the moments after Baase's shot. Finally, it is concerning that Bell-McGrew may have said, "chill out" and "I'm getting out" after Baase's shot, but those statements did not necessarily quell the threat given the split-second time frame, Narewski's reasonable concern that the shot might have come from Bell-McGrew, and the lack of evidence indicating Narewski *heard* those statements. *Cf. Chappell v. City of Cleveland*, 585 F.3d 901, 914 (6th Cir. 2009).

As with his *Terry* stop argument, plaintiff again generically relies on his expert witness's opinion that Narewski's use of force "was a greater level of force than other officers would have used under the same or similar circumstances [and] . . . [Bell-McGrew] never placed either Narewski or Baase in immediate jeopardy of serious bodily harm or death." To the extent these statements may be characterized as a legal opinion, a "use-of-force expert's legal conclusions" is only one fact in the court's reasonableness determination. *Thomas*, 854 F.3d at 366. In any event, our review of the undisputed facts and application of our caselaw leads us to reject the expert's speculation about what occurred.

For these reasons, the district court correctly concluded Officer Narewski did not engage in excessive force in violation of the Fourth Amendment.

3.

Because the district court correctly held the officers did not violate Bell-McGrew's constitutional rights, it also properly granted summary judgment in the City's favor on plaintiff's *Monell* claim. *See, e.g.*, *id*. at 367.

III.

Plaintiff's remaining two claims arise under Ohio law: wrongful death and survivorship against Officers Baase and Narewski. Ohio law immunizes police officers from suit unless their "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). Plaintiff contends that the officers acted in a reckless manner by "escalating" the situation—looking for criminal activity and then opening the car door and grabbing Bell-McGrew's hand—and that statutory immunity cannot lie given his contention that an officer's conduct can be both objectively reasonable under the Fourth Amendment and reckless for purposes of Ohio's statutory immunity provision. We disagree.

Plaintiff is correct that "[s]tatutory immunity under Ohio law, which applies to state law claims, is distinct from federal qualified immunity." *Stewart v. City of Euclid*, 970 F.3d 667, 676 (6th Cir. 2020). That notwithstanding, we have said many times over that "[w]hen federal qualified immunity and Ohio state-law immunity under § 2744.03(A)(6) rest on the same questions of material fact, we may review the state-law immunity defense through the lens of the federal qualified immunity analysis." *Downard for Est. of Downard v. Martin*, 968 F.3d 594, 602 (6th Cir. 2020) (internal citation omitted). And in the context of a police officer's use of deadly force, the analysis coincides: "[I]f an officer has probable cause to believe that a person poses an immediate threat of serious injury, the officer's use of deadly force against that person is not reckless." *Sabo v. City of Mentor*, 657 F.3d 332, 337 (6th Cir. 2011). Here, because both officers

reasonably perceived a serious threat of injury, they are entitled to statutory immunity under Ohio law. *Hicks*, 958 F.3d at 441 (holding that because an officer's use of deadly force was reasonable, he was entitled to statutory immunity under Ohio law); *Mullins*, 805 F.3d at 769 ("Because we find that [the officer]'s use of deadly force was not objectively unreasonable under the circumstances, it follows that he did not act with 'malicious purpose, in bad faith, or in a wanton or reckless manner,' as required to avoid statutory immunity under Ohio law."). Nor does it matter that they "escalated" the situation—no rational juror could conclude their actions displayed "conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Downard*, 968 F.3d at 602 (quoting *Argabrite v. Neer*, 75 N.E.3d 161, 164 (Ohio 2016)).

For these reasons, the district court correctly granted summary judgment in the officers' favor on plaintiff's state law claims.

## IV.

The last claim on appeal is whether the district court erred in denying in part plaintiff's motion for leave to file a sur reply. More specifically, plaintiff requested to file additional briefing on a state-law issue that he contends defendants raised for the first time in reply. But the district court disagreed, concluding defendants' reply argument "flow[ed] from the argument" made in their motion for summary judgment and was therefore not "new." Although plaintiff contends this was erroneous, he does not say why, rendering it abandoned. *See Burley v. Gagacki*, 834 F.3d 606, 618 (6th Cir. 2016).

## V.

For these reasons, the judgment of the district court is affirmed.